UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------------- X

ZWANENBERG FOOD GROUP (USA), INC., :
 :
 :
 Plaintiff, :
 : Docket No. _____
 -against- :
 : JURY TRIAL DEMANDED
TYSON REFRIGERATED PROCESSED :
MEATS, INC., :
 :
 Defendant. :
----------------------------------------------------------------- X

## COMPLAINT

Plaintiff Zwanenberg Food Group (USA), Inc. ("ZFG"), by and through its attorneys,

Bayard, P.A. and Morrison Cohen LLP, for its complaint against Defendant Tyson Refrigerated

Processed Meats, Inc. ("Tyson"), alleges as follows:

## INTRODUCTION

1. This action is brought by ZFG for a declaratory judgment that conditions

precedent have not been satisfied for ZFG to be required to make a $500,000 payment to Tyson

pursuant to the terms of an asset purchase agreement between the parties; for $549,019.65 of

damages as a result of Tyson's breach of said asset purchase agreement based upon a failure to

deliver certain assets; and for greater than $1,000,000 of damages and consequential damages as

a result of the breach of the implied covenant of good faith and fair dealing based upon Tyson's

bad-faith conduct which impeded ZFG's ability to conduct business with Wal-Mart Stores, Inc.

("Wal-Mart"), Tyson's largest customer, thereby depriving ZFG of the benefit it bargained for in

the transaction.

## PARTIES

2.      ZFG, an Ohio Corporation, with its principal place of business in Cincinnati, Ohio, is manufacturer and producer of canned meats and other food products.

3.      Tyson, a Delaware Corporation, is, upon information and belief, a wholly-owned subsidiary of Tyson Foods Inc., and is manufacturer and producer of food items whose principal place of business is in Springdale, Arkansas.

## JURISDICTION AND VENUE

4.      The parties have contractually consented to this Court's jurisdiction over this action.

5.      This Court also possesses jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because this action is between citizens of different states and involves an amount in controversy exceeding $75,000.00, exclusive of interest and costs and the parties have.

6.      Venue in this Court is appropriate pursuant to contract and 28 U.S.C. § 1391(a)(1).

## FACTS COMMON TO ALL COUNTS

**The Asset Purchase Agreement**

7.      In mid-2007, ZFG became interested in purchasing from Tyson certain inventory and equipment which Tyson was using for the production, manufacture and sale of canned luncheon meat marketed and sold to customers under certain private labels as well as Tyson registered trademarks "Bacon Grill" and "American Pride" (the "Assets"). The private labels were owned by the customers, but the products were produced, canned, and sold for the customers by Tyson using the Assets. Thus, the ability to maintain private label customers is

vital to the business as the goods produced by the Assets are not as fungible as traditional consumer products.

8.      The purpose of the transaction was for ZFG to purchase the Assets and begin manufacturing and selling the same products Tyson had sold to Tyson's private label customers.

9.      To that end, on November 8, 2007, the parties executed an Asset Purchase Agreement, whereby Tyson conveyed the Assets and certain Inventory to ZFG in exchange for cash consideration (the "APA"). A copy of the APA, the terms of which are expressly incorporated herein, is attached hereto as Exhibit A.

10.     For purposes of this action, the relevant provisions of the APA are as follows:

11.     Section 1.1 of the APA provides, in pertinent part, "…[Tyson] hereby agrees to sell, assign and convey the Assets and Inventory to the Purchaser…"

12.     Section 1.2 of the APA provides, in pertinent part, "The purchase price for the Assets shall consist of $2,543,560.08 (hereinafter referred to as the "Closing Payment") and $500,000 (hereinafter referred to as the "Transition Payment") (the sum of Closing Payment and the Transition Payment shall be hereinafter referred to as the "Purchase Price"). The Purchase Price shall be paid in the following manner: the Closing Payment of $2,543,560.08 as Closing; and the Transition Payment of $500,000 when the conditions of Section 5.6 have been met." (emphasis added).

13.     Section 1.3 of the APA provides, in pertinent part, "The Assets shall consist of…such assets and items are specified on Schedule 1.3…and the Assets shall also consist of the Inventory as listed on Schedule 1.3. The Inventory shall not include any inventories of the Seller that are obsolete, damaged, spoiled or unusable." (emphasis added). See Exhibit A, Schedule 1.3.

14.     Section 2.16 of the APA provides, in pertinent part, "Set forth on Schedule 2.16 is a list of each of the customers from which an aggregate of 95% of the Business's revenues for the preceding two years were derived (and the contact information of such customers). The relationships of the Seller and any of its Affiliates with such customers are good commercial working relationships." See Exhibit A, Schedule 2.16.

15.     Section 5.6 of the APA is the provision that provides the conditions that must be met to obligate ZFG to make the Transition Payment set forth in Section 1.2 of the APA. Section 5.6 of the APA, entitled "Post Closing Transition" provides as follows:

(a)     Provided that Purchaser shall make a request of seller for Transition Services within thirty (30) days after Closing, the Seller agrees to provide Transition Services as defined in subparagraph (b), below, to facilitate the transfer of the Businesses' relationships identified on Schedule 5.6 (hereinafter each such relationship referred to as "Transition Business" and, collectively, the "Transition Businesses") from the Seller to the Purchaser.

(b)     "Transition Services" shall include, and be limited to, the following:

(i)     Seller shall assist with Purchaser's first production run of the recipes transferred as part of the Assets;

(i)     Seller, working in conjunction with the Purchaser's representatives, will contact each such Transition Business and to facilitate the establishment of Purchaser's relationship with such Transition Business.

(c)     Upon completion of the Transition Services (provided that Purchaser has requested such) and Purchaser's receipt of orders for the first shipments of Inventory to each of the Transition Businesses (such receipt of orders referred to as the "First Orders"), the transactions contemplated by this Agreement shall be considered to be complete, and Seller shall be entitled to the Transition Payment, and such payment shall be paid by the Purchaser to Seller within two (2) business days after completion of the Transition Services or First Orders, whichever is later. (emphasis added).

16.     The Transition Businesses listed on Schedule 5.6 to the APA are Wal-Mart Stores, Inc. ("Wal-Mart"), H.E. Butt Grocery ("HEB"), Dollar General Corporation and

Castleberry/Bumble Bee Seafood, which accounted for 65.47%, 9.59%, 7.96% and 6.66%, respectively, of Tyson's total revenues from the business they were selling to ZFG. See Exhibit A, Schedule 2.16, 5.16.

17.    These Transition Businesses, particularly top revenue producer Wal-Mart, were a vital part of the transaction to ZFG.

18.    Indeed, if ZFG was unable to continue selling product to the Transition Businesses after the closing, ZFG would be severely disadvantaged.

19.    To that end, prior to the closing of the APA, ZFG insisted that Wal-Mart be advised that ZFG would begin selling the product's that Tyson had been supplying them with and that ZFG be allowed to contact Wal-Mart to establish a relationship and prepare to begin shipping product to Wal-Mart to satisfy its already existing orders.

20.    Tyson refused to permit ZFG to make any contact with any of the Transition Businesses until after the transaction had closed, citing a desire to keep the existence of the transaction known to only a limited number of people in its own organization.

21.    Upon the closing of the APA, ZFG paid Tyson $2,543,560.08 as required and promptly made a request for Tyson to provide Transition Services as contemplated by Section 5.6 of the APA.

**Tyson's Bad-Faith Destroys The Wal-Mart Business**

22.    Almost immediately after the closing, ZFG requested that Tyson begin its Transition Services with respect to Wal-Mart so that it could establish a relationship and continue selling product.

23.    In or about late November 2007, Tyson sought to arrange a meeting between representatives of ZFG, Bill Creighton (Tyson's Wal-Mart salesperson) ("Creighton"), and Amanda Davis ("Davis"), Wal-Mart's buyer.

24.     Before the meeting, Tyson advised ZFG that Davis had been made aware of the transition to ZFG and "was not concerned except to ask that the spec not be changed."

25.     At that meeting on November 28, 2007, it appears for the first time, Tyson revealed to Wal-Mart the existence of the transition to ZFG and that ZFG, not Tyson, would be supplying its already ordered products.

26.     Wal-Mart was apparently less than pleased with this revelation and in an e-mail dated December 11, 2007, Davis harshly criticized Tyson's eleventh hour, surreptitious actions, stating:

> Vendor agreements take a while to cleared through the system. I warned you of that in our meeting. In all honesty, Tyson should have never "sold off" the Great Value business before discussing it with us or even warning Wal-Mart. IT is not your brand to sell, we have not guaranteed any time or quantity commitments with you. It is our decision to award business as we see fit. Whenever we have a new supplier with GV, which Zwan[en]berg is, there are excessive quality checks that must be done in order to assure the quality is up to our standards. We are not going to rush this process and risk missing something potentially hazardous just because Tyson waited until the 11[th] hour to alert WM of the change.
>
> While we never want run outs on product there is not much we can do to change this now. Looks like we will have outs for awhile based on Tyson's lack of inventory. With all the various businesses Tyson has with Wal-Mart they should have known better than to not collaborate and work with us as it would have made the transition a lot easier.

27.     After receiving this e-mail, ZFG was now faced with the prospect of not being allowed to ship Tyson's existing orders to Wal-Mart, which would have effectively ended any chance of it ever being approved as a Wal-Mart supplier.

28.     Tyson thus devised a plan to ship product to Wal-Mart before ZFG became a Wal-Mart approved vendor.

29.    Under the arrangement developed by Tyson, ZFG would manufacture and deliver product to Tyson, who would in turn sell it to Wal-Mart to serve Wal-Mart's existing orders.

30.    While this initially solved the problem of servicing Wal-Mart's existing orders, it was not a solution to ZFG's problem concerning its desired business relationship with Wal-Mart.

31.    On February 26, 2008, Wal-Mart notified Tyson that it would not be using ZFG as its supplier and would begin using a new supplier on April 10, 2008 to fill orders for its private label brands of canned luncheon meat.

32.    To date, Wal-Mart has never placed a First Order with ZFG as defined by Section 5.6(c) of the APA.

**Tyson's Failure to Deliver Inventory**

33.    Tyson also breached the APA by failing to deliver certain Inventory it was required to by the APA.

34.    Following the closing of the APA, in or about November 2007, ZFG went to Tyson's plant in Portwall, Texas to assume control of the Inventory listed on Schedule 1.3 to the APA.

35.    What ZFG discovered when it arrived at Tyson's plant, is that many of the items listed on Schedule 1.3 to the APA simply were not there, had been consumed by Tyson following the closing or were determined to be obsolete, damaged, spoiled or unusable in breach of Section 1.3 of the APA.

36.    ZFG determined that the total value of the Inventory which Tyson failed to deliver is $549,019.65.

**The Instant Dispute**

37.    After ZFG determined the value of the Inventory Tyson failed to deliver, on March 19, 2008, ZFG sent Tyson a demand letter seeking within 30 days, return of the

$549,019.65, along with a schedule showing the items which were never delivered, were consumed or were obsolete, damaged, spoiled or unusable.

38.    Initially, Tyson appeared to take ZFG's demand seriously and responded by e-mail on May 8, 2007, with questions regarding some of the items addressed in ZFG's March 19, 2008 Demand.

39.    However, before ZFG could respond, on May 12 & 22, 2008, respectively, Tyson sent ZFG two letters demanding payment of the $500,000 Transition Payment pursuant to Section 5.6 of the APA.

40.    ZFG was taken aback by Tyson's demand, especially in light of Tyson's failure to deliver the required Inventory in breach of the APA and the fact that neither Wal-Mart nor HEB had placed First Orders with ZFG, an express condition precedent to any Transition Payment to Tyson.

41.    Nevertheless, on May 23, 2008, ZFG wrote to Tyson addressing each of its questions concerning its claims for payment, advising that the conditions precedent to Tyson's rights to the Transition Payment had not been met and once again demanding payment of $549,019.65 for ZFG's damages as a result of Tyson's breach of the APA.

42.    Tyson has failed to respond and ZFG has brought the instant action to enforce its rights.

## COUNT I
## DECLARATORY JUDGMENT

43.    Plaintiff repeats and realleges every allegation in paragraphs 1-42 of the Complaint as if fully stated herein.

44.    This claim is brought pursuant to 28 U.S.C. § 2201, which confers authority to the Federal Courts to declare the rights and other legal relations of any interested party seeking such declaration.

45.    Tyson has claimed that ZFG owes it the $500,000 Transition Payment contemplated by the APA.

46.    In order to be entitled to the Transition Payment, Section 5.6(c) requires, *inter alia*, that Tyson first complete the Transition Services; and that ZFG receive First Orders from each of the four Transition Businesses.  See Exhibit A, Section 5.6(c).

47.    As of this date, ZFG has not received any First Orders from Wal-Mart or HEB and thus the necessary conditions precedent to its Tyson's entitlement to the Transition Payment have not been met.

48.    As such, an actual and justifiable controversy presently exists as to Tyson's entitlement to the Transition Payment.  The controversy is of sufficient immediacy to justify the issuance of a declaratory judgment.

49.    Accordingly, this Court should declare that ZFG is not required to pay Tyson the $500,000 Transition Payment in accordance with the terms of the APA.  ZFG has no adequate remedy at law, and is entitled to invoke the equity powers of this Court to grant the relief requested herein.

## COUNT II
## BREACH OF CONTRACT

50.    Plaintiff repeats and realleges every allegation in paragraphs 1-49 of the Complaint as if fully stated herein.

51.    The APA is valid and enforceable contract.

52.     Section 1.3 of the APA required Tyson to deliver to ZFG, *inter alia*, the Assets and Inventory described on Schedule 1.3 to the APA, which Inventory could not include any inventories of Tyson that were obsolete, damaged, spoiled or unusable.

53.     In breach of Section 1.3 of the APA, many of the items listed on Schedule 1.3 to the APA simply were not delivered to ZFG, had been consumed by Tyson following the closing or were determined to be obsolete, damaged, spoiled or unusable.

54.     ZFG has been damaged by Tyson's breach in the amount of $549,019.65.

## COUNT III
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

55.     Plaintiff repeats and realleges every allegation in paragraphs 1-54 of the Complaint as if fully stated herein.

56.     The APA is a valid an enforceable contract.

57.     An implied duty of good faith and fair dealing is interwoven into every contract including the APA.

58.     Implied in the APA is a duty upon Tyson to deal with ZFG in good faith.

59.     Implied in the APA is a duty upon Tyson to not impede and/or interfere in any way with ZFG's ability to conduct and/or transact business with the Transition Businesses.

60.     The purpose of the APA was so that ZFG could acquire the Assets and Inventory and then use them to sell product to Tyson's customers, most importantly of those, Wal-Mart.

61.     Indeed, ZFG maintained a reasonable expectation that Tyson would not impede and/or interfere with ZFG's ability to conduct and/or transact business with the Transition Businesses.

62.     Due to its long-standing relationship with Wal-Mart and all the various business Tyson has with Wal-Mart, Tyson was well aware of the strict approval procedures and quality

checks that Wal-Mart requires of its suppliers before they can start shipping product and must have known that Wal-Mart would have required that Tyson advise them that ZFG was going to be taking over its orders prior to the closing of the APA in order for ZFG to continue supplying Wal-Mart.

63.     Despite this knowledge, Tyson, in bad-faith and in breach of the implied covenant of good faith and fair dealing, failed to give Wal-Mart sufficient prior notice of the transaction with ZFG and refused to let ZFG make direct contact with Wal-Mart prior to the closing of the APA.

64.     As a result of Tyson's bad-faith conduct, Wal-Mart has refused to do business with ZFG, thereby resulting in a loss 65.47% of the value of the business ZFG purchased by the APA and any opportunity to do future business with Wal-Mart.

65.     ZFG has thus been damaged in an amount of greater than $1,000,000, plus consequential damages in an amount to be determined at trial, as a result of Tyson's bad-faith conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for entry of a judgment from this Court:

a.     On Count I, declaring that ZFG does not owe Tyson the $500,000 Transition Payment, and awarding ZFG its costs and reasonable attorney's fees;

b.     On Count II, awarding ZFG damages in the amount of $549,019.65 plus accrued interest, pre-judgment interest, costs and reasonable attorney's fees;

c.     On Count III, awarding ZFG damages in an amount of greater than $1,000,000, plus consequential damages in an amount to be determined at trial, pre-judgment interest, costs and reasonable attorney's fees;

d.     Such other and further relief as this Court may deem just and proper.

MORRISON COHEN LLP

BAYARD, P.A.

Edward P. Gilbert (eg3730)
Ethan R. Holtz (eh3324)
909 Third Avenue
New York, New York 10022
(212) 735-8600

Peter B. Ladig (pl3513)
Stephen B. Brauerman (sb4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000
pladig@bayardlaw.com
sbrauerman@bayardlaw.com

Attorneys for Plaintiff

Dated: May 30, 2008

# EXHIBIT A-1

EXECUTION COPY
11/8/07

ASSET PURCHASE AGREEMENT

BY AND BETWEEN

ZWANENBERG FOOD GROUP (USA) INC.

as Purchaser

AND

TYSON REFRIGERATED PROCESSED MEATS, INC.

as Seller

November 8, 2007

#B60631 v4 \16176 \301

Page

ARTICLE I PURCHASE AND SALE OF ASSETS ...................................................1

1.1    Purchase and Sale of Assets. ...............................................................1
1.2    Purchase Price. ....................................................................................1
1.3    Definition of Assets. ...........................................................................2


ARTICLE II REPRESENTATIONS AND   WARRANTIES OF THE SELLER ...................2

2.1    Incorporation; Subsidiaries. ................................................................2
2.2    Authorization. .....................................................................................3
2.3    Conflicts. .............................................................................................3
2.4    Financial Statements. ..........................................................................3
2.5    Absence of Certain Changes. ..............................................................4
2.6    Title. ....................................................................................................4
2.7    Inventory. ............................................................................................5
2.8    Contractual and Other Obligations. .....................................................5
2.9    Interests of Affiliates...........................................................................5
2.10   Reserved...............................................................................................5
2.11   Intellectual Property............................................................................5
2.12   Trade Names. .......................................................................................6
2.13   Disputes and Litigation. ......................................................................6
2.14   Licenses; Franchises, Rights. ..............................................................6
2.15   Product Defects. ..................................................................................7
2.16   Customers. ...........................................................................................7
2.17   Returns.................................................................................................7
2.18   Reserved...............................................................................................7
2.19   Disclosure............................................................................................7
2.20   Equipment. ..........................................................................................7
2.21   Regulatory Matters. .............................................................................7

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE PURCHASER .........8

3.1    Incorporation. ......................................................................................8
3.2    Authorization. .....................................................................................8
3.3    Conflicts. .............................................................................................9
3.4    Disputes and Litigation. ......................................................................9
3.5    Consents. .............................................................................................9

ARTICLE IV CLOSING DELIVERIES ...............................................................9

4.1    Payment. ..............................................................................................9
4.2    Delivery of Assets. ..............................................................................9

0860631 v4 \16176 \301

| | | |
|---|---|---|
| 4.3 | Consents. | 10 |
| 4.4 | Pure Food Guarantee. | 10 |
| 4.5 | Purchaser Closing Certificate. | 10 |
| 4.6 | Seller Closing Certificate. | 11 |
| 4.7 | Additional Transactions. | 11 |
| 4.8 | Bulk Transfers Laws. | 11 |

**ARTICLE V POST-CLOSING COVENANTS** ............................................. **11**

| | | |
|---|---|---|
| 5.1 | Accounts Receivable. | 11 |
| 5.2 | Withheld Payments. | 11 |
| 5.3 | Non-Competition. | 11 |
| 5.4 | Confidentiality and Non-Use. | 12 |
| 5.5 | Further Action. | 13 |
| 5.6 | Post-Closing Transition. | 13 |
| 5.7 | Transfers; Risk of Loss. | 13 |

**ARTICLE VI INDEMNIFICATION** ............................................. **14**

| | | |
|---|---|---|
| 6.1 | Basis of Indemnity. | 14 |
| 6.2 | Purchaser's Indemnity. | 14 |
| 6.3 | Indemnification Procedures. | 15 |
| 6.4 | Payment. | 15 |
| 6.5 | Limitations. | 16 |
| 6.6 | Exclusive Remedy | 16 |

**ARTICLE VII BROKERS AND FINDERS** ............................................. **17**

| | | |
|---|---|---|
| 7.1 | Seller's Obligations. | 17 |
| 7.2 | Purchaser's Obligations. | 17 |

**ARTICLE VIII MISCELLANEOUS** ............................................. **17**

| | | |
|---|---|---|
| 8.1 | Notices. | 17 |
| 8.2 | Survival of Representation. | 18 |
| 8.3 | Successors and Assigns. | 18 |
| 8.4 | Entire Agreement. | 18 |
| 8.5 | Expenses. | 18 |
| 8.6 | Partial Invalidity. | 18 |
| 8.7 | Governing Law. | 19 |
| 8.8 | Specific Performance. | 19 |
| 8.9 | Consent to Jurisdiction. | 19 |
| 8.10 | Captions; Accounting Terms. | 19 |
| 8.11 | Counterparts. | 19 |

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** made the 8th day of November, 2007 (this "**Agreement**"), by and between **TYSON REFRIGERATED PROCESSED MEATS, INC.**, a corporation organized and existing under the laws of the State of Delaware (hereinafter referred to as the "**Seller**"), and **ZWANENBERG FOOD GROUP (USA) INC.**, a corporation organized and existing under the laws of the State of Ohio (hereinafter referred to as the "**Purchaser**").

## W I T N E S S E T H:

**WHEREAS**, the Seller uses certain assets listed on **Schedule 1.3** in the production, manufacturing and sale of canned luncheon meat marketed and sold under certain private labels for customers identified on **Schedule 5.6** and the tradenames "**Bacon Grill**" and "**American Pride**" (such activities, as presently conducted, being hereinafter referred to as the "**Business**"); and

**WHEREAS**, the Purchaser desires to acquire from the Seller those assets identified on **Schedule 1.3** (as more particularly hereinafter defined referred to, collectively, as the "**Assets**") and Inventory (as more particularly hereinafter defined) so that the Purchaser can operate the Business at Purchaser's facility, and the Seller desires to sell the Assets and Inventory to the Purchaser upon the terms and subject to the conditions hereinafter provided;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

### 1.1 Purchase and Sale of Assets.

Subject to the terms and conditions of this Agreement, and on the basis of the representations, warranties and covenants herein contained, the Seller hereby agrees to sell, assign and convey the Assets and Inventory to the Purchaser, free and clear of any mortgage, deed of trust, security interest, assignment, pledge, lien or other charge or encumbrance of any nature whatsoever (hereinafter referred to, collectively, as "**Liens**"), and the Purchaser hereby agrees to purchase, acquire and accept the Assets from the Seller, free and clear of any Liens.

### 1.2 Purchase Price.

(a)    The purchase price for the Assets shall consist of $2,543,560.08 (hereinafter referred to as the "**Closing Payment**") and $500,000.00 (hereinafter referred to as the "**Transition Payment**") (the sum of the Closing Payment and the Transition Payment shall be hereafter referred to as the "**Purchase Price**"). The Purchase Price shall be paid in the

RBG0631 v4\16176\301

following manner: the Closing Payment of $2,543,560.08 at Closing; and the Transition Payment of $500,000.00 when the conditions of Section 5.6 have been met.

(b)    The value of the Purchase Price shall be allocated among the Assets as set forth on **Schedule 1.2** annexed hereto, provided such proposed allocation is consistent with Section 1060 of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "**Code**") and the parties mutually agree to such allocation. Otherwise, the value of the Purchase Price and Assumed Liabilities shall be allocated in a manner consistent with Section 1060 of the Code.

### 1.3 Definition of Assets.

The Assets shall consist of certain of the Seller's assets used in the Business, but only insofar as such assets and items are specified on **Schedule 1.3** annexed hereto, and the Assets shall also consist of the **Inventory** as listed on Schedule 1.3. The Inventory shall not include any inventories of Seller that are obsolete, damaged, spoiled or unusable.

## ARTICLE II

## REPRESENTATIONS AND

## WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to the Purchaser that, except as set forth in written disclosure schedules delivered by the Seller to the Purchaser (hereinafter referred to as the "**Disclosure Schedules**") or as may otherwise be limited or qualified herein, each of the statements contained in this Article II is true and correct as of the date hereof. The Disclosure Schedules shall be arranged in Sections and Subsections corresponding to the Sections and Subsections of this Article II that such Disclosure Schedules intend to modify. The term "**Seller's Knowledge**" shall mean the actual or constructive knowledge of the Seller.

### 2.1 Incorporation; Subsidiaries.

The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the full corporate power and authority to own or hold under lease the Assets and to perform all its obligations under the agreements to which it is a party (including, without limitation, this Agreement). The Seller is duly qualified to conduct business under the laws of each other jurisdiction wherein it is required to be so qualified in order to own the Assets, or engage in the Business, except for any such failures to be qualified that would not reasonably be expected to have a material adverse effect on the Business or the Assets. The copies of the certificate of incorporation and by-laws of the Seller which have been delivered to the Purchaser are complete and correct as of the date hereof.

### 2.2 Authorization.

#860631 v4 \16176 \301

2

The Seller has all requisite power and authority to execute and deliver this Agreement and the other Transaction Documents (as hereinafter defined) and to perform its obligations hereunder and thereunder. The execution and delivery by the Seller of this Agreement and the other Transaction Documents to which it is a party, the performance by the Seller of its covenants and agreements hereunder and thereunder and the consummation by the Seller of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the Seller. This Agreement has been duly and validly executed and delivered by the Seller, and constitutes the valid and legally binding obligation of the Seller enforceable against the Seller in accordance with its terms, except as may be limited by bankruptcy, insolvency or other laws affecting generally the enforceability of creditors' rights and by limitation on the availability of equitable remedies. The other Transaction Documents have been duly and validly executed and delivered by the Seller and, assuming such other Transaction Documents constitute valid and binding obligations of the Purchaser, to the extent it is a party thereto, constitute valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforceability of creditors' rights and by limitations on the availability of equitable remedies. For purposes hereof, the "**Transaction Documents**" shall consist of this Agreement and all other documents, instruments and other agreements entered into pursuant to this Agreement.

### 2.3 **Conflicts**.

Except as set forth in **Schedule 2.3**, neither the execution and delivery by the Seller of this Agreement and the other Transaction Documents to which the Seller is a party, nor the consummation by the Seller of the transactions contemplated herein or therein, will violate any provision of the certificate of incorporation or by-laws of the Seller, or any material law, rule, regulation, writ, judgment, injunction, decree, determination, award or other order of any court, government, or governmental agency or instrumentality, domestic or foreign, or conflict with or result in any breach of any of the terms of or constitute a default under or result in the termination of the creation or imposition of any material Lien of any nature pursuant to the terms of any contract or agreement to which the Seller is a party or by which the Seller, or any of the Assets is bound. Except as set forth in **Schedule 2.3**, no consent, approval, order, notice to or other authorization of any Governmental Body (as hereinafter defined), or of any other third parties are required in connection with the execution and delivery by the Seller of, or performance of its obligations under, this Agreement or the other Transaction Documents to which the Seller is a party. For purposes hereof, "**Governmental Body**" shall mean any (i) federal, state, county, city, town, village, district or other jurisdiction; (ii) federal, state, municipal, local, foreign or other government; or (iii) governmental or quasi-governmental authority (including any governmental agency, branch, department, office or entity and any court or other tribunal).

### 2.4 **Financial Materials**.

(a)      The Seller has delivered to the Purchaser: (i) A Canning Operations Detail dated as of June 8, 2007, (ii) a Canning Operation Asset Listing dated as of April 30, 2007, (iii) a Spare Parts Inventory Stock Valuation at Standard Cost for Canning Equipment, dated as of June

6, 2007, (iv) a Summary of Gross Margins and Volume by Product Recipe for fiscal years 2004, 2005, 2006 and the first half of 2007, (v) Tyson Canned Luncheon Meat Customer List year to date fiscal year 2007 New Pounds, and (iv) Historical Sales Information (hereinafter referred to collectively as the "**Financial Materials**").

(b)     The Financial Materials were prepared for Seller's management's use, and to Seller's Knowledge, accurately present the matters contained therein as the same relate to the Business as of the dates and for the periods indicated therein, though Purchaser acknowledges that the Financial Materials are for Seller's internal business use and, as such, are unaudited. The methods and procedures used to compile the Financial Materials were consistently applied throughout the periods to which such Financial Materials relate.

### 2.5 Absence of Certain Changes.

(a)     Subsequent to December 31, 2006, the Seller has not, except as disclosed in **Schedule 2.5**:

(i)     mortgaged, pledged or subjected to any Lien any of the Assets;

(ii)     entered into any transaction in connection with the Business other than in the ordinary course of business consistent with past practice, except in connection with the execution and performance of this Agreement and the transactions contemplated hereby;

(iii)     suffered any material damage, destruction, or loss to any of the Assets (whether or not covered by insurance); or

(iv)     suffered any adverse change in the Seller's business, properties, operations, prospects or condition, financial or otherwise as it relates to the Business and there has been no occurrence, circumstance nor combination thereof which individually or in the aggregate has had or reasonably could be expected to have a material adverse effect on the Business or the Assets;

### 2.6     Title.

The Seller has good and marketable title to and the legal right and power to convey all of the Assets, free and clear of all Liens, except for Permitted Liens, if any.  The Seller has not received notice of any material violation of, or material default under, any law, ordinance, order, regulation, or governmental or contractual requirement relating to the Assets which remains uncured or has not been dismissed. All leases and licenses included in the Assets pursuant to which the Seller leases or licenses any of the Assets from others are in good standing, valid and effective in accordance with their respective terms, and there is not, under any of such leases or licenses, any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default, or would constitute a basis for a claim of force majeure or other claim of excusable delay or non-performance), in each case by the Seller or, to the Seller's knowledge, by any other party thereto. All the tangible personal property owned or leased by the Seller is in good operating condition and repair subject only to ordinary wear and tear, and conforms to and complies in all material respects with all applicable laws, ordinances, orders,

regulations or governmental or contractual requirements relating to their operation in the Business as conducted at Seller's Houston, Texas facility.  Set forth in **Schedule 2.7** is a list of all locations, and the proprietors thereof, at which any of the Assets not currently held by the Seller are located.   For purposes hereof, an "**Affiliate**" shall mean any person or entity controlling, controlled by or under common control with the subject referenced.

### 2.7 Inventory.

The Inventory is listed and described on **Schedule 1.3**.  All Inventory is of a quality and quantity usable in the ordinary course of business, and the present quantities of Inventory are reasonable in light of the historical operations of the Business.  All Inventory (i) which are finished goods are merchantable, marketable and are fit for their intended purpose, and (ii) which consists of works-in-progress is being completed in a commercially reasonable manner, given the Seller's current operation of the Business.

### 2.8 Contractual and Other Obligations.

The Seller has not received any advance payment against any contract, agreement or other arrangement for the delivery of Inventory to the extent not yet performed, and the Seller has not assigned to any other party any rights to payment or receivables in respect of any contract, agreement or other arrangement for the delivery of Inventory performed or not yet performed.

### 2.9 Interests of Affiliates.

None of the Seller's officers or directors, or any of the Seller's Affiliates, has any interest in any property, real or personal, tangible or intangible, used in or pertaining to the Business. None of the Seller's officers or directors, or any of the Seller's Affiliates, owns, directly or indirectly, any interest in (other than securities of a publicly held corporation traded on any national securities exchange in the United States of America, provided that in no event is such party a controlling person of or a member of a group which controls, such corporation and such Affiliate does not directly or indirectly, own more than five percent of any class of securities of such corporation), or is a director, officer or stockholder of, any business which is a competitor or a significant supplier of the Business. There are no situations involving the personal interest of any of the Seller's officers, directors or any other Affiliates of the Seller which may be generally characterized as a "**conflict of interest**."

### 2.10    Reserved.

### 2.11    Intellectual Property.

Set forth in **Schedule 2.11** are: (i) a list of all of the registered and common law trademarks, service marks, tradenames, logos, domain names, registered copyrights and other similar rights and applications for each of the foregoing associated with the products sold by the Business; (ii) a list of all licenses and other agreements pursuant to which the Seller has acquired and/or received the right and authority to develop, make, have made, use, sell, offer for sale, import, or otherwise dispose of products and/or services in the operation of the Business; and

#860631 v4 \16176 \301

(iii) a list of all material trade secrets, specifications, kitchen processes, and proprietary know-how associated with the recipes associated with the products sold by the Business. The Seller owns and possesses all necessary right, title and interest in and to all such proprietary rights owned or licensed by it, free and clear of all Liens other than Permitted Liens, required to operate the Business. No adverse threats or claims have been received by Seller, and no dispute has arisen, with respect to any of the said proprietary rights, the products manufactured, sold or distributed pursuant to such proprietary rights or otherwise in connection with the Business; and the operations of the Seller and the use by it of its proprietary rights do not involve infringement or claimed infringement of any patent, trademark, servicemark, tradename, copyright, license, trade secret, know-how or similar right of any other party. The Seller has not suffered or allowed any of its trade secrets, know-how or other intellectual or intangible property rights, which are material to the business and operation of the Business, to enter into the public domain except to the extent such entrance has not had or could not be reasonably be expected to have, a material adverse effect on the Seller, the Assets or the Business.

**2.12    Trade Names.**

No other persons or businesses have received from the Seller the right to use nor, to the Seller's Knowledge, are there any other persons or businesses using any trade mark, service mark, tradename, logo or domain name set forth in **Schedule 2.11**, or any variant thereof, singly or in combination with any other term, and no persons or businesses otherwise using any such trade mark, service mark, tradename, logo, domain name or any variant thereof, singly or in combination with any other term, have ever attempted, to restrain the Seller from using such mark, name, logo or any variant thereof, singly or in combination with any other term.

**2.13    Disputes and Litigation.**

There is no action, suit, proceeding, or claim, pending or to the Seller's Knowledge threatened by any third party, and no investigation by any Governmental Body, pending or to the Seller's Knowledge threatened, against the Seller, regarding any of the Assets or the Business (before any Governmental Body), nor is there any outstanding order, writ, judgment, stipulation, injunction, decree, determination, award, or other order of any Governmental Body against the Seller regarding any of the Assets or the Business.

**2.14    Permits, Governmental Approvals.**

The Seller has (or has made timely application for) all permits and other governmental approvals necessary to enable the Seller to carry on the Business as currently conducted except where the failure to do so has not individually or in the aggregate had or could reasonably be expected to have a material adverse effect on the Business. All such permits and other governmental approvals are in full force and effect, there has been no default or breach thereunder, and there is no pending or, to the Seller's Knowledge threatened proceeding under which any may be revoked, terminated or suspended. Neither the Seller nor the conduct of the Business, has violated, nor is alleged to have violated, in a material way, any law, rule, regulation, judgment, stipulation, injunction, decree, determination, award or other order of any government, or governmental agency or instrumentality, domestic or foreign, binding upon the

#BG0631 v4 \16176\301

6

Seller where the failure to do so individually or in the aggregate could reasonably be expected to have a material adverse effect on the Assets.

### 2.15   Product Defects.

There are no defects in the materials, procedures, recipes or production techniques for the products currently produced or sold by the Business which would adversely affect the quality of such products, given the Seller's operation of the Business.

### 2.16   Customers.

Set forth on **Schedule 2.16** is a list of each of the customers from which an aggregate of 95% of the Business's revenues for the preceding two years were derived (and the contact information of such customers). The relationships of the Seller and any of its Affiliates with such customers are good commercial working relationships.

### 2.17   Returns

The Seller has no obligation outside of the ordinary course of the Business to accept any returns from or make allowances to any customers with respect to the Business or any of the Assets.

### 2.18   Reserved.

### 2.19   Disclosure.

No representation or warranty made under any provisions of this Agreement and none of the information furnished by the Seller set forth herein, in the exhibits or schedules hereto or in any document delivered by the Seller to the Purchaser in accordance with this Agreement, or any authorized representative of the Purchaser, pursuant to this Agreement, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements herein or therein not misleading.

### 2.20   Equipment.

Set forth on **Schedule 1.3** is a list which includes equipment used by the Seller in connection with the operation of the Business to be conveyed to Purchaser hereunder (hereinafter referred to as the "**Equipment**"). The Equipment is in good condition and repair, ordinary wear and tear excepted, and is useable in the ordinary course of Seller's conduct of the Business consistent with past practice. All structural and mechanical components of the Equipment are sound and free of any material structural, mechanical or other defect, and, is in good working order, subject to ordinary wear and tear. There are no defects in such Equipment, or other conditions relating to Equipment, which materially and adversely affect the value of such Equipment, ordinary wear and tear excepted.

### 2.21   Regulatory Matters.

#860631 v4 \16176 \301

The Seller has produced the Inventory pursuant to the appropriate licenses, certificates, permits, consents, orders, approvals and authorizations from the United States Department of Agriculture (hereinafter referred to as the "**USDA**") required for its conduct of the Business. The Seller has made available to the Purchaser all submissions made by it to the USDA and the USDA's responses thereto (and other material correspondence received from or submitted to the USDA), including, but not limited to, all USDA warning letters, regulatory letters, and notice of adverse finding letters and the relevant responses, received by the Seller or any agent thereof in the past two (2) years, in each case relative to the Business.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser represents, warrants and covenants that each of the statements contained in this Article III is true and correct as of the date hereof.

### 3.1 Incorporation.

The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio, and has full corporate power and authority to acquire the Assets and to assume the Assumed Liabilities hereunder. The Purchaser is duly qualified to conduct business under the laws of each other jurisdiction wherein the failure so to qualify would have a material adverse effect on its ability to consummate the transactions contemplated hereunder.

### 3.2 Authorization.

The Purchaser has all requisite power and authority to execute and deliver this Agreement and the other Transaction Documents and to perform its obligations hereunder and thereunder. The execution and delivery by the Purchaser of this Agreement and the other Transaction Documents to which it is a party, the performance by the Purchaser of its covenants and agreements hereunder and thereunder, and the consummation by the Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the Purchaser. This Agreement has been duly and validly executed and delivered by the Purchaser and, assuming this Agreement constitutes the valid and legally binding obligation of the Seller, constitutes the valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforceability of creditors' rights and by limitations on the availability of equitable remedies. The other Transaction Documents to which it is a party have been duly and validly executed and delivered by the Purchaser and, assuming such other Transaction Documents constitute valid and binding obligations of the Seller, constitute valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, or other laws affecting generally the enforceability of creditors' rights and by limitations on the availability of equitable remedies.

### 3.3 Conflicts.

#860631 v4 \16176 \301

8

Neither the execution and delivery by the Purchaser of this Agreement and the other Transaction Documents to which the Purchaser is a party, nor the consummation by the Purchaser of the transactions contemplated herein or therein will violate any provision of the certificate of incorporation or by-laws of the Purchaser or any law, rule, regulation, writ, judgment, injunction, decree, determination, award, or other order of any court, government or governmental agency or instrumentality, domestic or foreign, or conflict with or result in any breach of any of the terms of or constitute a default under or result in the termination of or the creation or imposition of any Lien of any nature pursuant to the terms of any contract or agreement to which the Purchaser is a party or by which the Purchaser or any of its assets and properties is bound. No consent, approval, order, notice to or other authorization of any Governmental Body, or of any other third parties are required in connection with the Purchaser's execution and delivery of, or its performance of the obligations under, this Agreement or any other agreement contemplated hereby to which the Purchaser is a party.

### 3.4 Disputes and Litigation.

There is no action, suit, proceeding, or claim, pending or to the Purchaser's knowledge threatened by any third party, and no investigation by any Governmental Body, pending or to the Purchaser's knowledge threatened, against the Purchaser, nor is there any outstanding order, writ, judgment, stipulation, injunction, decree, determination, award, or other order of any Governmental Body specifically naming and binding the Purchaser, which challenges or seeks to prevent, enjoin, alter or materially delay the transactions contemplated hereby.

### 3.5 Consents.

No notices, reports, registrations or other filings are required to be made by the Purchaser, nor are any consents, approvals or authorizations required to be obtained by the Purchaser from any Governmental Authority or any other person, in connection with the execution, delivery or performance by the Purchaser of this Agreement or any other Transaction Documents.

## ARTICLE IV

## CLOSING DELIVERIES

### 4.1 Payment.

Simultaneous with the execution of this Agreement (herein referred to as the "**Closing**"), in payment for the Assets, the Purchaser shall deliver to the Seller, by wire transfer to such account as shall have been designated by the Seller, immediately available funds in an amount equal to the Closing Payment.

### 4.2 Delivery of Assets.

Delivery of the Assets shall be made by the Seller to the Purchaser at the Closing by delivering (i) a Bill of Sale, (ii) a Trademark Assignment Agreement, and (iii) such other

instruments of transfer the Purchaser might reasonably require to effectuate the transactions contemplated herein.

### 4.3 Consents.

The Seller shall provide evidence that it has obtained or given any necessary or required consents, acknowledgements, approvals, permits and orders and waivers with respect to the transactions contemplated by this Agreement. In addition, the Seller shall provide evidence that all material notices have been given to governmental agencies, where the failure to do so individually and in the aggregate could reasonably be expected to have a material adverse effect on the Assets.

### 4.4 Pure Food Guarantee.

Seller guarantees that the Inventory sold by Seller to Buyer hereunder is not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act of June 25, 1938, as amended, including the Food Additives Amendment of 1958 and the Food Allergen Labeling and Consumer Protection Act of 2004; the Federal Meat Inspection Act, as amended, the Poultry Products Inspection Act, as amended (collectively, the "Acts") or within the meaning of any state food and drug law, the adulteration and misbranding provisions of which are identical with or substantially the same as those found in the Acts. The Inventory was not produced or shipped in violation of sections 404 or 301(d) of the FDC Act. Seller guarantees that no articles of Inventory sold by Seller to Buyer hereunder are classified as hazardous materials subject to Department of Transportation Regulations contained in 49 CFR 170-189. Seller represents that it has implemented HACCP food safety systems in all its production facilities as required by the USDA/FSIS. Seller represents that it shall comply with the provisions of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002. Notwithstanding anything to the contrary in the foregoing, Seller does not guarantee against the Products becoming adulterated or misbranded within the meaning of the Acts by reason of causes beyond Seller's control after shipment or transfer of title under this Agreement.

EXCEPT IN THE EVENT SUCH BELOW-DESCRIBED DAMAGES ARE ASSESSED AND ACTUALLY AWARDED BY A COURT OF COMPETENT JURISDICTION IN FAVOR OF A THIRD-PARTY AGAINST BUYER, NEITHER PARTY SHALL BE LIABLE TO THE OTHER OR ANY THIRD PARTY FOR INDIRECT, SPECIAL, INCIDENTAL, TORT, ECONOMIC, COVER OR CONSEQUENTIAL DAMAGES, THAT ARISE OR ARE ALLEGED TO HAVE ARISEN OUT OF ANY BREACH OF THIS PURE FOOD GUARANTEE, EVEN IF A PARTY OR ITS AFFILIATES HAVE BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING.

### 4.5 Purchaser Closing Certificate.

The Seller shall receive a certificate of the Secretary of the Purchaser, in form and substance reasonably satisfactory to the Seller, with respect to the accuracy of the resolutions of the Purchaser's board of directors authorizing this Agreement and the consummation of the transactions contemplated thereby.

#860631 v4 \16176 \301

### 4.6 Seller Closing Certificate.

The Purchaser shall receive a certificate of the Secretary of the Seller, in form and substance reasonably satisfactory to the Purchaser, with respect to the accuracy of the resolutions of the Seller's board of directors authorizing this Agreement and the consummation of the transactions contemplated hereby.

### 4.7 Additional Transactions.

Pursuant to the terms and conditions of this Agreement, the Seller shall take all steps reasonably required by the Purchaser to put the Purchaser in actual possession and operating control of the Business and the Assets at the Closing. Furthermore, and without limiting the generality of the foregoing provisions of this Article IV, the parties hereto from time to time after the Closing, at the request of the other party hereto and without further consideration, shall execute and deliver further instruments of transfer, assignment and assumption and take such further action as the Purchaser may reasonably require more effectively to transfer and assign to, and vest in, the Purchaser the Assets sold hereunder and custody thereof.

### 4.8 Bulk Transfers Laws.

The Purchaser and the Seller hereby waive compliance with the provisions of any so-called "**bulk transfer law**" of any jurisdiction in connection with the sale of the Assets to Purchaser.

## ARTICLE V

## POST-CLOSING COVENANTS

### 5.1 Accounts Receivable.

Subsequent to the Closing, the Seller shall, promptly, deliver to the Purchaser, any funds and any checks, notes, drafts and other instruments for the payment of money, received by the Seller for the payment of products purchased from the Business following the Closing, provided, however, that such products were conveyed to the Purchaser pursuant to this Agreement. Likewise, the Purchaser shall, promptly, deliver to the Seller any funds and any checks, notes, drafts and other instruments for the payment of money, received by the Purchaser for the payment of products purchased from the Business prior to the Closing, provided, however, that such products were not conveyed to the Purchaser pursuant to this or any other Agreement.

### 5.2 Withheld Payments.

The Seller shall promptly pay to the Purchaser all amounts, if any, due from customers identified on **Schedule 5.6** which are not paid due to such customers offsetting of amounts due by the Seller to such customer.

### 5.3 Non-Competition.

#860651 v4 \16176 \301

(a)     Except for any business, trade, or occupation that the Seller engages in as of the date of this Agreement, neither the Seller, nor any affiliated entity thereof, shall, for the period expiring one year subsequent to Closing, and without any additional consideration, directly or indirectly, whether as principal, agent, distributor, representative, stockholder or otherwise:

(i)     engage or invest in, own, manage, operate, control or participate in the ownership, management, operation or control of, be associated or in any manner connected with, or render assistance, services or advice to, any business which (A) engages in the sale of "canned luncheon meat" as that term is defined under current USDA regulations (a "Competing Business"), or (B) plans or intends to engage, or is investigating the feasibility of engaging in, a Competing Business, provided, however, that this provision shall not prohibit the Seller or one of its Affiliates from acquiring, investing in, operating, managing, controlling, or planning or intending to engage or investigating the feasibility of engaging with a third-party company which owns or otherwise operates a Competing Business, if such Competing Business is less than thirty (30%) of the total business of such third-party company, as measured by total revenues. In the event of Seller's acquisition of such a Competing Business, Seller shall grant Purchaser a right of first refusal to purchase such Competing Business if Seller desires to dispose of such Competing Business, and further, during such one-year non-compete period, the Seller will not allow the Competing Business to seek to displace or replace any of the sales made by the Business to existing customers; however, this shall not prohibit the third-party company from continuing any existing sales to such customers or providing additional sales at any such customer's request; or

(ii)     employ, solicit or otherwise seek to employ or engage as an employee, associate, independent contractor, consultant, agent, sub-agent, distributor, representative or otherwise, whether full or part-time, any person or entity who is or was, during the six months prior to the date hereof, an employee, associate, independent contractor, consultant, agent, sub-agent, distributor or representative of the Purchaser or any of its Affiliates, or otherwise work to terminate such person or entity's employment or other relationship with the Purchaser or any Affiliate.

(b)     The parties intend that the covenants contained in Paragraph (a) immediately preceding shall be construed as a series of separate covenants, one for each state of the United States. Except for geographical coverage, each such separate covenant shall be deemed identical in terms and binding to the fullest extent permitted under existing applicable law.

## 5.4 Confidentiality and Non-Use.

From and for one (1) year after the date hereof, and without in any manner limiting the Purchaser's sole right, title and interest in and to the Assets acquired hereunder, the Seller shall maintain in confidence, and the Seller shall cause its directors, officers, employees, advisors, attorneys, accountants, lenders, agents or others associated with them or their Affiliates, respectively, to maintain in confidence and not to divulge to any third party, and take all precautions to protect, any information, constituting or obtained or used in connection with the

Business. Notwithstanding the foregoing, the obligations of confidentiality set forth above shall not extend to information which is within the public domain as of the date hereof or thereafter comes within the public domain other than as a result of disclosure by the Seller or any of their respective representatives in violation of this Agreement. Furthermore, the Seller may use such information to the same extent it was used by and in the Seller's or any of its Affiliates' businesses prior to the date hereof.

### 5.5 Further Action.

Each party will do, execute, acknowledge and deliver, or will cause to be done executed, acknowledged or delivered, all such further acts, transfers, assignments, conveyances, powers of attorney and assurances as may be necessary or reasonably requested by the other party hereto to carry out and consummate the transactions contemplated by this Agreement.

### 5.6 Post-Closing Transition.

(a)     Provided that Purchaser makes a request of Seller for Transition Services within thirty (30) days after Closing, the Seller agrees to provide Transition Services as defined in subparagraph (b), below, to facilitate the transfer of the Businesses' relationships identified on **Schedule 5.6** (hereinafter each such relationship referred to as a **"Transition Business"** and, collectively, the **"Transition Businesses"**) from the Seller to the Purchaser.

(b)     **"Transition Services"**) shall include, and be limited to, the following:

(i)     Seller shall assist with Purchaser's first production run of the recipes transferred as part of the Assets;

(ii)     Seller, working in conjunction with the Purchaser's representatives, will contact each such Transition Business and to facilitate the establishment of Purchaser's relationship with such Transition Business.

(c)     Upon completion of the Transition Services (provided that Purchaser has requested such) and Purchaser's receipt of orders for the first shipments of Inventory to each of the Transition Businesses (such receipt of orders referred to as the **"First Orders"**), the transactions contemplated by this Agreement shall be considered to be complete, and Seller shall be entitled to the Transition Payment, and such payment shall be paid by Purchaser to Seller within two (2) business days after the completion of the Transition Services or First Orders, whichever is later.

(d)     In the event that the Seller completes the Transition Services with respect to a Transition Business but such Transition Business refuses or otherwise fails to place any order for Inventory with the Purchaser, and such refusal or failure is based on any act, omission, or fault of the Purchaser, then the Transition Payment shall be due and payable as provided for herein.

### 5.7 Transfers; Risk of Loss.

No later than twenty-one (21) days after Closing, Purchaser shall arrange for the transport of all equipment, parts and inventory purchased in accordance herewith from the Seller's Houston, Texas facility. Risk of loss of each of the Assets shall be borne by the Seller until such time as Purchaser, its carrier, or any agent thereof, takes possession of such Assets.

## ARTICLE VI

## INDEMNIFICATION

### 6.1 Seller's Indemnity.

From and after the Closing the Seller shall, jointly and severally indemnify and hold harmless the Purchaser and its successors and assigns (each hereinafter referred to as a "**Purchaser Indemnified Party**") from and against all damages, costs, expenses, losses, claims, demands, liabilities and/or obligations (other than punitive damages) including, without limitation, reasonable fees and disbursements of counsel (hereinafter referred to, collectively, as "**Damages**"), suffered by a Purchaser Indemnified Party arising from, relating to, or in any way sustained, or incurred by reason of:

(a)     the material breach of any of the obligations, covenants, agreements, representations or warranties made by the Seller in accordance with this Agreement;

(b)     any liabilities or obligations (contingent or other) of the Seller which are not Assumed Liabilities;

(c)     the failure of the Seller to pay any taxes required by law to be paid by Seller in connection with the transactions contemplated hereby; or the failure by Seller to pay any taxes in connection with all taxable periods ending on or prior to the date hereof or pursuant to any assessment or charge (including penalties and interest, if any) related to such periods in regards to Seller's operation of the Business and ownership of the Assets;

(d)     the failure of the Seller to pay and discharge all obligations and liabilities of the Seller arising as a result of this Agreement;

(e)     any and all warranty or other claims and obligations in respect of activities undertaken by the Seller prior to Closing;

(f)     any amounts any customer of the Business offsets against payments due to the Purchaser as the result of transactions between the Seller and such customer; or

(g)     any defects in Inventory, if and to the extent such claims relate to products sold or manufactured by the Seller, regardless of whether such products were finished goods or work-in-progress on the date hereof. For the avoidance of doubt, the Seller's indemnification obligation hereunder shall not extend to defects in work-in-progress to the extent such defects are not present at the time of the Closing.

### 6.2 Purchaser's Indemnity.

#860631 v4 \16176 \301

Purchaser (together with the Seller, the "**Indemnifying Parties**") shall indemnify and hold the Seller and its successors and assigns (each hereinafter referred to as a "**Seller Indemnified Party**" and together with the Purchaser Indemnified Parties the "**Indemnified Parties**") harmless from, against and in respect of any and all Damages suffered by a Seller Indemnified Party arising from, relating to, or in any way sustained or incurred by reason of:

(a)     the Purchaser's failure to pay, discharge or perform any of its liabilities or obligations constituting or with respect to the Assumed Liabilities;

(b)     the Purchaser's operation of the Business and use of the Assets after the Closing;

(c)     the material breach by the Purchaser of the obligations, covenants, agreements, representations or warranties set forth in this Agreement or in any of the Transaction Documents.

### 6.3 Indemnification Procedures.

An Indemnified Party shall promptly notify any Indemnifying Party of any claim, demand, action or proceeding for which indemnification may be sought under Article VI hereof, and, if such claim, demand, action or proceeding by or on behalf of any person or entity other than a party to this Agreement or its successors and assigns would result in Damages hereunder (hereinafter referred to as a "**Third Party Claim**"), the Indemnified Parties will have the right at their expense to participate in the defense thereof using counsel reasonably acceptable to them. Any omission so to notify any Indemnifying Party as aforesaid shall not relieve any Indemnifying Party from any liability they may have to any Indemnified Party to the extent that the Indemnifying Party is not prejudiced as a proximate result of such failure. Notwithstanding the foregoing, the Indemnifying Party shall have the right in all respects to control the defense with respect to any such Third Party Claim. In connection with any such Third Party Claim, the Indemnifying Parties and the Indemnified Party shall cooperate with each other and provide each other with reasonable access to relevant books and records in their possession. No such Third Party Claim shall be settled without the prior written consent of either the Indemnifying Party or the Indemnified Parties which consent may not be unreasonably withheld or delayed.

### 6.4 Payment.

In the event that either of the Indemnified Parties shall incur any Damages in respect of which indemnity may be sought pursuant to this Article VI, the Indemnifying Parties, or either of them, shall be given written notice thereof promptly by the Indemnified Party, which notice shall specify the amount and nature of such Damages and include the request of the Indemnified Party for the indemnification of such amount. The Indemnifying Parties shall within ten days pay to the Indemnified Party the amount of the Damages so specified. Notwithstanding, the Indemnifying Parties may reasonably request support and/or evidence of such Damages and shall have, at a minimum, ten (10) business days (but in no event more than thirty (30) calendar days) after receipt of such requested support and/or evidence to tender the amount of Damages, provided that such amount shall be subject to offset by the Indemnifying Parties of any portion that is subject to any good faith claim or dispute of the Indemnifying Parties.

#860631 v4 \16176 \301

**6.5 <u>Limitations</u>.**

(a)    No payment shall be made by an Indemnifying Party based upon Damages incurred by any Indemnified Party under Article VI until the amount of Damages suffered or incurred by such Indemnified Party taken as a whole (after deducting insurance proceeds and third party recoveries paid to or for the benefit of any of the Indemnified Party) shall total, in the aggregate, twenty-five thousand and 00/100 dollars ($25,000) (the "<u>**Minimum Damages**</u>"), in which event the aggregate amount of such Damages suffered or incurred by the Indemnified Party taken as a whole, including the Minimum Damages (after deducting any insurance proceeds and third party recoveries paid to or for the benefit of any of the Indemnified Party), shall be paid in accordance with the terms of this Article VI.

(b)    The maximum liability of the Seller under this Article VI shall be limited to five hundred thousand dollars ($500,000) (the "<u>**Maximum Damages**</u>"); provided, however, that the foregoing Maximum Damages limitation shall not apply to breaches of the representations set forth in Sections 2.6, 2.7, 2.15, and for any damage incurred by Purchaser for product liability for which the Seller would be liable under the Pure Food Guaranty provided under Section 4.4 with respect to those items of Inventory which constitute works-in-progress or finished goods at Closing; provided, however, that the maximum liability arising out of a breach of Sections 2.6 shall be limited to the value placed upon such items of Equipment giving rise to Damages in the allocation of the Purchase Price described in Section 1.2(b).

(c)    Notwithstanding anything in this Article VI to the contrary, each Indemnified Party hereunder shall use its commercially reasonable efforts to mitigate the value of Damages suffered as a result of an occurrence specified in Section 6.1 or Section 6.2, as the case may be and the amount of any Damages for which indemnification is provided under this Article VI shall be reduced by any related recoveries to which the Indemnified Party actually realizes or receives under insurance policies or other related payments received from third parties.

(d)    Except as otherwise provided herein, the indemnification obligations of the Seller under this Article VI shall terminate on the one-year anniversary date of the Closing, except that indemnification obligations relating to (i) a breach of any representation or warranty found in Sections 2.1, 2.2, and 2.6; and (ii) obligations (A) arising from the breaches of representations or warranties under Sections 2.7 or 2.15, and (B) for product liability for which the Seller would be liable under the Pure Food Guarantee provided under Section 4.4 with respect to those items of Inventory which constitute works-in-progress or finished goods at Closing, shall survive pursuant to any applicable statute of limitations.

**6.6 <u>Exclusive Remedy</u>**

The procedures set forth in this Article VI shall serve as each parties' exclusive recourse in the event it asserts a claim for a breach of representation or warranty by the Seller under this Agreement, other than claims of fraud.

#860631 v4 \16176 \301

16

## ARTICLE VII

## BROKERS AND FINDERS

### 7.1 Seller's Obligations.

The Purchaser shall not have any obligation to pay any brokerage, finders or similar fee or other compensation to any person, firm or other corporation dealt with by the Seller and Seller hereby agrees to indemnify and save the Purchaser harmless from any liability, damages cost or expense arising from any breach of this Article VII by the Seller.

### 7.2 Purchaser's Obligations.

The Seller shall not have any obligation to pay any brokerage, finders or similar fee or other compensation to any person, firm or corporation dealt with by the Purchaser, and the Purchaser hereby agrees to indemnify and save the Seller harmless from any liability, damage, cost or expense arising from any breach of this Article VII by the Purchaser.

## ARTICLE VIII

## MISCELLANEOUS

### 8.1 Notices.

All notices, requests or instruction hereunder shall be in writing and delivered personally or sent by overnight delivery service, as follows:

    (1)    if to the Seller:

> Tyson Foods, Inc.
> 2210 West Oaklawn Drive
> Springdale, Arkansas 72762-6999
> Attention: Matt Ellis (CP081)

> with a copy to:

> Tyson Foods, Inc.
> 2210 W. Oaklawn Drive
> Springdale, AR 72762-6999
> Attention: Nathan Hodne (CP004)

    (2)    if to the Purchaser:

> Zwanenberg Food Group (USA), Inc.
> 3640 Muddy Creek Road
> Cincinnati, Ohio 45238

#860631 v4 \16176 \301

Attention: Frank Schmitt

with a copy to:

Morrison Cohen LLP
909 Third Avenue
New York, NY 10022
Attention: Stephen I. Budow, Esq.

Any of the above addresses may be changed at any time by notice given as provided above; provided, however, that any such notice of change of address shall be effective only upon receipt.

**8.2 Survival**. Notwithstanding any investigation at any time made on or behalf of any party hereto, each representation and warranty of the parties hereto herein contained shall (except for the representations and warranties provided in 2.1, 2.2, 2.6, 2.7, and 2.15, the survival of which shall be consistent with the indemnification obligations provided in Section 6.5 herein) survive for a period of one (1) year following the Closing hereunder.

**8.3 Successors and Assigns**.

This Agreement and the terms hereof shall inure to the benefit of the parties hereto and their respective successors and assigns. This Agreement and the rights and obligations hereunder may not be assigned to a third party (other than an affiliate of such transferee) without the prior written consent of the other party hereto. There shall be no third party beneficiaries to this Agreement.

**8.4 Entire Agreement**.

This Agreement and the documents referred to herein (including the Disclosures Schedules and Exhibits, if any) contain the entire agreement between the parties hereto with respect to the transactions contemplated hereby, and no modification hereof shall be effective unless in writing and signed by the party against which it is sought to be enforced.

**8.5 Expenses**.

Except as otherwise specifically provided for by this Agreement, each of the parties hereto shall bear and pay such party's own costs and expenses incurred in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the transactions contemplated hereby.

**8.6 Partial Invalidity**.

Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without rendering invalid or unenforceable the remaining terms and provisions of this Agreement, or any such terms in any other jurisdiction. If any provision of this

#860631 v4 \16176 \301

Agreement is so broad as to be unenforceable, such provision shall be interpreted to be only so broad as is enforceable.

### 8.7 Governing Law.

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable in the case of agreements among residents of Delaware, made and to be performed entirely within such State.

### 8.8 Specific Performance.

The Purchaser and the Seller recognize that any breach of the terms of this Agreement may give rise to irreparable harm for which money damages would not be an adequate remedy, and accordingly agree that, in addition to other remedies, any non-breaching party may be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce the terms and provisions of this Agreement by a decree of specific performance in any action instituted in any court of the United States or any state thereof, or any other jurisdiction, having jurisdiction without the necessity of proving the inadequacy as a remedy of money damages.

### 8.9 Consent to Jurisdiction.

Each of the parties hereto agrees that any legal action or proceeding arising out of or relating to this Agreement may be instituted in a federal or state court located in the City of Wilmington, State of Delaware. By the execution and delivery of this Agreement, each of the parties to this Agreement irrevocably consents to and submits to the jurisdiction of such courts for all purposes in connection with any controversy, claim, action or proceeding arising out of or relating to this Agreement or any modification or extension hereof. The foregoing shall not limit the rights of any party to bring any legal action or proceeding or to obtain execution of judgment in any appropriate jurisdiction. Each of the parties hereto further agrees that final judgment against it in any such action or proceeding shall be conclusive and may be enforced to any other jurisdiction within or outside the United States of America by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence thereof.

### 8.10 Captions; Accounting Terms.

The captions appearing herein are for the convenience of the parties only and shall not be construed to affect the meaning of the provisions of this Agreement.

### 8.11 Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

*[remainder of page intentionally left blank]*

#860631 v4 \16176 \301

19

**IN WITNESS WHEREOF,** by the parties hereto as of this Agreement has duly executed the date first above written.

ZWANENBERG FOOD GROUP (USA) INC.

By: _____

      Name: FRANK SCHMITT

      Title: PRESIDENT

TYSON REFRIGERATED PROCESSED MEATS, INC.

By: _____

      Name:

      Title:

#8G0031 v4 \16176 \301

20

**IN WITNESS WHEREOF**, by the parties hereto as of this Agreement has duly executed the date first above written.

ZWANENBERG FOOD GROUP (USA) INC.

By: _____
     Name:
     Title:

TYSON REFRIGERATED PROCESSED MEATS, INC.

By: _____
     Name:
     Title: SVP Finance & Treasurer
     JH

# SCHEDULES

## for the

## ASSET PURCHASE AGREEMENT

### by and between

## ZWANENBERG FOOD GROUP (USA) INC.

### and

## TYSON REFRIGERATED PROCESSED MEATS, INC.

These Schedules are furnished by Tyson Refrigerated Processed Meats, Inc. (the "Seller"), as of the date hereof, pursuant to and as part of the Asset Purchase Agreement by and between Seller and Zwanenberg Food Group (USA) Inc. dated as of November 8, 2007 (the "Agreement"). Capitalized terms used but not defined in the Schedules shall have the meanings ascribed to such terms in the Agreement. These Schedules relate to certain matters concerning the disclosures required by the Agreement. These Schedules are qualified in their entirety by reference to specific provisions of the Agreement, and are not intended to constitute, and shall not be construed as constituting, representations or warranties of the Sellers except as and to the extent provided in the Agreement. Matters reflected in the Schedules are not necessarily limited to the matters required by the Agreement to be disclosed in the Schedules. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature. Items disclosed on any one Schedule are deemed to be disclosed for all other sections of the Schedules to the extent that it is reasonably apparent on its face that such disclosure is applicable to such other section(s).

**Schedule 1.2**

See IRS Form 8594 attached and incorporated herein.

Schedule 1.3

Spare Parts

| Item Number | Description | Quantity On Hand | UM | Unit Cost | Extended Dollars |
|---|---|---|---|---|---|
| 1007784 | CASTER, SWIVEL 6 x 2 | 6 | EA | 18.19 | 109.14 |
| 1007785 | CASTER, RIGID 6 x 2" | 8 | EA | 14.39 | 115.12 |
| 1007786 | CASTER, RIGID 10 x 2 | 14 | EA | 28.82 | 403.48 |
| 1007276 | GASKET, RETORT DOOR | 1 | EA | 253.64 | 253.64 |
| 1009057 | THERMOMETER, MIG CAL | 2 | PR | 446.00 | 892.00 |
| 1007777 | VALVE, PNM BASKET LO | 2 | EA | 198.89 | 397.78 |
| 1008017 | BELT, TIMMING T5/305 | 7 | EA | 7.21 | 50.47 |
| 1007323 | SENSOR, SMART-EYE IR | 6 | EA | 171.20 | 1,027.20 |
| 1007776 | FILTER, EXHAUST VAC | 9 | EA | 415.15 | 3,736.35 |
| 1003092 | SEAL, OIL MECHANICAL | 3 | EA | 185.00 | 555.00 |
| 1005829 | BELT, HEAT SHRINK | 1 | EA | 430.00 | 430.00 |
| 1007080 | BELT, V METRIC | 3 | EA | 2.55 | 7.65 |
| 1007042 | SWITCH, PROXIMITY | 4 | EA | 130.00 | 520.00 |
| 1007551 | SWITCH, PROXIMITY | 2 | EA | 80.89 | 161.78 |
| 1007088 | MOTOR, 5 HP | 1 | EA | 576.44 | 576.44 |
| 1007030 | TAPE, TEFLON HEAT | 30 | FT | 6.49 | 194.70 |
| 1008483 | MODULE, EHT ASSEMBLY | 3 | EA | 425.00 | 1,275.00 |
| 1008069 | LEVER, PIN RELEASE F | 8 | EA | 75.75 | 606.00 |
| 1008070 | BUSHING, PIN LEVER R | 7 | EA | 160.61 | 1,124.24 |
| 1007128 | CAN PUSHER, COMPLETE | 1 | EA | 847.14 | 847.14 |
| 1007130 | PUSHER, END FEED | 5 | EA | 45.55 | 227.77 |
| 1007132 | CAM ROLL, | 9 | EA | 54.50 | 490.50 |
| 1007133 | HOLDER, W/CAM ROLL | 1 | EA | 414.17 | 414.17 |
| 1007140 | CAM ROLL, | 4 | EA | 70.84 | 283.34 |
| 1007142 | SEAMING ROLL, 1 OPER | 2 | EA | 91.33 | 182.66 |
| 1007148 | BEARING, THRUST 2-1/ | 3 | EA | 187.50 | 562.50 |
| 1007149 | BUSHING, SEAMING HEA | 4 | EA | 145.83 | 583.32 |
| 1007150 | BUSHING, TOGGLE LEVE | 4 | EA | 118.75 | 475.00 |
| 1007153 | BEARING, THRUST SKFS | 2 | EA | 45.50 | 91.00 |
| 1007129 | CHAIN, TABLE TOP 3-1 | 40 | FT | 10.25 | 410.00 |
| 1007139 | CHAIN, TABLE TOP W/C | 32 | FT | 65.37 | 2,091.84 |
| 1007138 | MAGNET, BASE PLATE o | 1 | EA | 4.50 | 4.50 |
| 1007298 | SWITCH, PROXIMITY BA | 2 | EA | 52.32 | 104.64 |
| 1007754 | RELAY, 24VAC 60HZ | 2 | EA | 21.91 | 43.82 |

| 1007757 | POWER SUPPLY, 24VDC | 1 | EA | 205.49 | 205.49 |
|---|---|---|---|---|---|
| 1007780 | BOARD, CIRCUIT CAN S | 2 | EA | 470.69 | 941.38 |
| 1007781 | OUTPUT CARD, CAN SEA | 2 | EA | 301.86 | 603.72 |
| 1007125 | SCREW, FILLISTER HEA | 10 | EA | 0.48 | 4.80 |
| 1007126 | PLATEN, | 1 | EA | 387.87 | 387.87 |
| 1007127 | PLATEN, 93 X 47MM | 2 | EA | 281.18 | 562.36 |
| 1007131 | PIN, | 12 | EA | 5.81 | 69.72 |
| 1007146 | PIN, LEAF | 3 | EA | 47.33 | 141.99 |
| 1007143 | LEVER, ROLL TOGGLE | 4 | EA | 87.50 | 350.00 |
| 1007144 | LEVER, PIN TOGGLE | 4 | EA | 68.58 | 274.32 |
| 1007145 | LEVER, STUD SEAMING | 12 | EA | 72.81 | 873.72 |
| 1007151 | LEVER, LEAF SEAMING | 7 | EA | 194.17 | 1,359.19 |
| 1007310 | MOTOR, CONVEYOR 380V | 1 | EA | 716.00 | 716.00 |
| 1007136 | PLATE, NYLON F/TURNT | 3 | EA | 300.00 | 900.00 |
| 1007134 | PISTON, BRASS FRONT | 1 | EA | 376.66 | 376.66 |
| 1007121 | CHUCK, SEAMING 93 X | 1 | EA | 636.67 | 636.67 |
| 1007123 | ROD, KNOCK-OUT | 1 | EA | 216.67 | 216.67 |
| 1007137 | STARWHEEL, OUTLET | 1 | EA | 106.06 | 106.06 |
| 1007147 | STUD, SEAMING ROLL | 9 | EA | 34.95 | 314.55 |
| 1007313 | GEARBOX, 50:1 RATIO | 2 | EA | 537.46 | 1,074.92 |
| 1007124 | SPRING, | 12 | EA | 14.43 | 173.16 |
| 1007152 | SPRING, SEAMING LEVE | 7 | EA | 57.14 | 399.98 |
| 1007621 | VALVE, PNEUMATIC CAS | 6 | EA | 145.72 | 874.32 |
| 1007755 | VALVE, PNM 24VAC - O | 3 | EA | 123.86 | 371.58 |
| 1008002 | HEATER, 950 WATT 220 | 2 | EA | 90.60 | 181.20 |
| 1008003 | HEATER, FLAT 300 WAT | 4 | EA | 59.68 | 238.72 |
| 1008004 | PAD, PICK UP | 6 | EA | 205.08 | 1,230.48 |
| 1008005 | PADS, PICK UP LAP SI | 6 | EA | 205.08 | 1,230.48 |
| 1009432 | SILENCER, BUSH | 8 | EA | 155.31 | 1,242.48 |
| 1008001 | SWITCH, PROXIMITY | 12 | EA | 184.57 | 2,214.84 |
| 1007778 | VALVE, PNM LABELER | 2 | EA | 122.46 | 244.92 |
| 1007779 | VALVE, PNM LABELER | 4 | EA | 136.81 | 547.24 |
| 1007585 | VARISTOR | 2 | EA | 2.47 | 4.94 |
| 1007562 | SCREW, HEX HD M 6X8 | 30 | EA | 6.37 | 191.10 |
| 1007563 | WASHER, 24X16.2X2 | 31 | EA | 1.67 | 51.77 |
| 1007580 | KIT, HARDWARE | 2 | EA | 122.82 | 245.64 |
| 1007577 | KNIFE | 1 | EA | 127.39 | 127.39 |
| 1007578 | KNIFE SET | 2 | EA | 811.67 | 1,623.34 |
| 1007581 | BELT, TIMING | 1 | EA | 56.13 | 56.13 |
| 1007566 | BUSHING 16.2 X 19.1 | 29 | EA | 4.47 | 129.63 |

| 1008286 | BUSHING, CAN SPINNER | 17 | EA | 2.95 | 50.15 |
|---|---|---|---|---|---|
| 1007571 | BRUSH, BR = .008 H=3 | 4 | EA | 19.07 | 76.28 |
| 1007572 | BRUSH, BR = .008 H=4 | 2 | EA | 19.07 | 38.14 |
| 1007573 | BRUSH, BR = .008 H=4 | 2 | EA | 31.27 | 62.54 |
| 1007574 | BRUSH, BR = .008 H=5 | 5 | MT | 50.02 | 250.10 |
| 1007575 | BRUSH, TYP 1 BR=.70X | 4 | EA | 5.46 | 21.84 |
| 1007576 | BRUSH, TYP 1 BR=.70X | 2 | EA | 87.00 | 174.00 |
| 1007587 | AGRESSION SPARK | 2 | EA | 4.40 | 8.80 |
| 1007588 | SCANNER | 3 | EA | 148.27 | 444.81 |
| 1007589 | RELAY | 1 | EA | 23.04 | 23.04 |
| 1007590 | SWITCH, SAFETY | 2 | EA | 91.58 | 183.16 |
| 1007591 | DETECTOR, PROXIMITY | 4 | EA | 36.23 | 144.92 |
| 1007592 | SWITCH, PRXIMITY | 2 | EA | 49.03 | 98.06 |
| 1007594 | SWITCH, PROXIMITY | 4 | EA | 217.85 | 871.40 |
| 1007595 | PHOTO EYE | 3 | EA | 157.48 | 472.44 |
| 1007597 | PROBE, TEMPERATURE | 3 | EA | 79.53 | 238.59 |
| 1007598 | DETECTOR, PROXIMITY | 3 | EA | 46.95 | 140.85 |
| 1007599 | PROBE, TEMPERATURE | 1 | EA | 75.57 | 75.57 |
| 1007600 | THERMISTOR | 1 | EA | 124.19 | 124.19 |
| 1007584 | ASU, CENTERING HEAD | 2 | EA | 347.27 | 694.54 |
| 1007596 | COUPLER, OPTO | 4 | EA | 70.05 | 280.20 |
| 1007564 | GASKET, RD 47.6 X 33 | 32 | EA | 2.82 | 90.24 |
| 1007567 | RING 19 X 16.2 X 10 | 94 | EA | 4.19 | 393.86 |
| 1007601 | CARTRIDGE, HEATER | 12 | EA | 20.83 | 249.96 |
| 1007561 | GRIPPER, FINGER | 8 | EA | 15.89 | 127.12 |
| 1007579 | GRIPPER-ONLY ORDER W | 1 | EA | 2,646.13 | 2,646.13 |
| 1007593 | LAMP, EIKO 757 | 2 | EA | 0.41 | 0.82 |
| 1007557 | PLATE, 8X20X90 LG | 2 | EA | 241.06 | 482.12 |
| 1007558 | PLATE, 15.0X20.0 L 1 | 2 | EA | 230.20 | 460.40 |
| 1007559 | CAM, FOLLOWER 16X M | 8 | EA | 39.01 | 312.08 |
| 1007560 | LEVER, ROLLER | 4 | EA | 41.37 | 165.48 |
| 1007586 | REGULATOR | 3 | EA | 347.05 | 1,041.15 |
| 1007565 | SEAL RD 60X99X16 | 5 | EA | 26.88 | 134.40 |
| 1007568 | SPRING, COMPRESS OD= | 17 | EA | 1.48 | 25.16 |
| 1007569 | SPRING, EXT. OD=10.1 | 11 | EA | 1.10 | 12.10 |
| 1007570 | SPRING, COMPRESS OD= | 16 | EA | 2.17 | 34.72 |
| 1007582 | SPRING, COMPRESS OD= | 16 | EA | 2.55 | 40.80 |
| 1007583 | SPRING, COMPRESS | 22 | EA | 3.44 | 75.68 |
| 1004059 | CABLE, LINX 10-4PIN | 3 | EA | 385.00 | 1,155.00 |

| | | | | | |
|---|---|---|---|---|---|
| 1004061 | CABLE, CONNECTOR 5PI | 3 | EA | 40.00 | 120.00 |
| 1001179 | SOLVENT, LINX MARQUE | 12 | EA | 8.50 | 102.00 |
| 1005758 | SOLUTION,WASH THERMA | 38 | EA | 32.50 | 1,235.00 |
| 1003903 | FILTER, INK MAIN | 3 | EA | 170.00 | 510.00 |
| 1003904 | FILTER, INK PRE-PUMP | 2 | EA | 45.00 | 90.00 |
| 1007081 | FILTER, DUST | 2 | EA | 55.00 | 110.00 |
| 1007625 | FILTER, REPLACEMENT | 3 | EA | 50.00 | 150.00 |
| 1007623 | KIT,"A"LINX 6200 RPR | 2 | EA | 340.00 | 680.00 |
| 1001177 | INK, BLACK LINX MARQ | 16 | EA | 28.00 | 476.00 |
| 1005759 | INK,BLACK/RED THERMA | 33 | EA | 47.50 | 1,567.50 |
| 1007082 | DAMPER, FEED ASSEMBL | 1 | EA | 195.00 | 195.00 |
| 1003110 | NOZZLE, GLUE | 3 | EA | 31.75 | 95.25 |

| | | | | |
|---|---|---|---|---|
| | | | | |
| TOTAL ($US) | | | | 57,995.21 |

Inventory as of October 30, 2007 (actual Inventory may vary through ordinary course of business
sales and orders of Seller between October 30, 2007 and the Closing)

| Sub T2 | G/L Cat | Item No. | Description | Unit Cost | UM | Quantity | Cost |
|---|---|---|---|---|---|---|---|
| Gold Cans | 1310 | 40168 | LNCH MT - HAM & PORK | 1.1907 | LB | 196,200.75 | 233,609.69 |
| | | 40214 | LNCH LF - HAM & PORK | 1.072 | LB | 2,393.25 | 2,565.56 |
| | | 40268 | LNCH MT - HAM & PORK | 1.1907 | LB | 1,584.00 | 1,886.02 |
| | | 40308 | LNCH LF - CHK&BF HAL | 1.0835 | LB | 7,871.25 | 8,528.24 |
| | | 40318 | LNCH MT - CHICKEN HA | 0.9259 | LB | 840.00 | 777.73 |
| | | 40367 | LNCH LF - HAM E&P | 0.8507 | LB | 79,168.50 | 67,346.00 |
| | | 40369 | LNCH MT - LITE HAM&P | 1.1788 | LB | 911.25 | 1,074.18 |
| | | 40371 | LNCH MT - HAM & BACO | 1.2481 | LB | 3,798.00 | 4,740.41 |
| | | 40378 | LNCH MT - CHICKEN | | | | |
| | | 40381 | LNCH LF - CKN,HAM & | 0.9701 | LB | 47,075.25 | 45,669.26 |
| | | 40408 | LNCH LF - CHK & HAM | 0.9288 | LB | 16,479.00 | 15,305.70 |
| | | 40434 | LNCH MT - TURKEY | | | | |
| | | 40464 | LNCH MT - CHICKEN HA | 0.9217 | LB | 414.00 | 381.60 |
| | | 40474 | LNCH MT - TURKEY HAL | 1.0929 | LB | 1,584.00 | 1,731.21 |
| | | 40710 | LNCH LF - CHK&BF HAL | 1.0199 | LB | 400.50 | 408.46 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 40860 | LNCH LF - HAM & PORK | 1.1913 | LB | 864.00 | 1,029.31 |
| | | 40865 | LNCH LF - HAM & BACN | 1.2247 | LB | 10,368.00 | 12,697.34 |
| | | 40870 | LNCH LF - LITE HAM & | 1.2832 | LB | 6,383.25 | 8,190.99 |
| | | | | | | 376,335.00 | $ 405,941.70 |
| FG | 1315 | 41357 | ALB LMT-HAM & PORK | 1.3516 | LB | - | - |
| | | 41367 | GRV LMT-PORK & HAM | 1.3382 | LB | 50,403.06 | 67,449.93 |
| | | 41453 | BRY LMT-HAM & PORK | | | | |
| | | 41463 | BRY LMT-HAM & PRK EX | | | | |
| | | 41502 | HCF LLF-CHICKEN & PO | 1.0913 | LB | 378.00 | 412.51 |
| | | 41512 | HCF LMT-HAM & PORK | | | | |
| | | 41657 | ALB LMT-LITE HAM & P | 1.3398 | LB | 1,908.00 | 2,556.26 |
| | | 41663 | PIC LMT-CHICKEN | | | | |
| | | 41673 | MRQ LMT-CHICKEN | | | | |
| | | 41763 | CSO LMT-CHICKEN | | | | |
| | | 41774 | ZYD LMT-CHICKEN HALA | 1.0827 | LB | 612.00 | 662.61 |
| | | 41802 | CHP LLF-CHICKEN & PO | 1.0567 | LB | 846.00 | 893.94 |
| | | 41823 | PIC LMT-TURKEY | | | | |
| | | 41872 | HCF LMT-LITE HAM & P | | | | |
| | | 41882 | HCF LMT-BACON GRILL | | | | |
| | | 42007 | SHM LMT-HAM & PORK | 1.3516 | LB | 792.00 | 1,070.49 |
| | | 42017 | SHM LLF-CHICKEN & PO | 1.0889 | LB | 1,800.00 | 1,959.99 |
| | | 42052 | SHA LMT-PORK & HAM | | | | |
| | | 42237 | LIG LLF-CHK & PORK E | 1.0917 | LB | 180.00 | 196.51 |
| | | 42247 | LIG LMT-HAM & PORK | 1.3508 | LB | - | |
| | | 42257 | LIG LMT-HAM & PORK E | 1.3526 | LB | 5,400.00 | 7,303.86 |
| | | 42342 | FST LMT-HAM & PORK | | | | |
| | | 42352 | FST LLF-CHICKEN & PO | 1.0898 | LB | 216.00 | 235.39 |
| | | 42422 | SUP LLF-PORK E&P | 1.0011 | LB | 594.00 | 594.64 |
| | | 42602 | CAR LMT-CHICKEN | 1.0768 | LB | 162.00 | 174.45 |
| | | 42612 | FDL LMT-HAM & PORK | 1.3519 | LB | 1,854.00 | 2,506.51 |
| | | 42707 | ACM LMT-HAM & PORK | 1.3508 | LB | 162.00 | 218.82 |
| | | 42717 | ACM LMT-LITE HAM & P | 1.3389 | LB | 612.00 | 819.40 |
| | | 42727 | JWL LMT-HAM & PORK | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | 42777 | AMP LMT HAM & PORK E | 1.3516 | LB | 396.00 | 535.24 |
| | | 42807 | UNI LMT-CHICKEN HALA | | | | |
| | | 42827 | ADG LLF-CKN,HAM & BA | 1.1314 | LB | 5,247.00 | 5,936.51 |
| | | 42847 | BUD LMT HAM & PORK | 1.3516 | LB | 270.00 | 364.94 |
| | | 42857 | FLV LMT HAM & PORK E | 1.3516 | LB | 1,080.00 | 1,459.76 |
| | | 42865 | CKG LNCH LF | 1.2358 | LB | 32,400.00 | 40,040.10 |
| | | 42917 | HCF LLF-HAM & BACN | 1.4005 | LB | 432.00 | 605.02 |
| | | 42927 | HCF LLF-HAM & PORK | 1.3538 | LB | 18.00 | 24.37 |
| | | 42937 | HCF LLF-LITE | 1.4457 | LB | 54.00 | 78.07 |
| | | | | | | 105,816.06 | $ 136,099.32 |
| GEN | 1568 | 439999 | BOX:11.6x8x7.3 LMT M | 0.0503 | EA | 27,110.00 | 1,363.63 |
| | | 609221 | BOX:11.6x8x7.3 LMT T | 0.0491 | EA | 8,900.00 | 436.99 |
| GEN Total | | | | | | 36,010.00 | $ 1,800.62 |
| GLD | 1565 | 439993 | GOLD LMC 12oz  NO UP | 0.237 | EA | 499,877.00 | 118,470.85 |
| GLU | 1586 | 704003 | GLUE KRONES CAN LABE | 3.182 | LB | 155.00 | 493.21 |
| | | 704004 | GLUE, TRAY FORMER 34 | 1.7275 | LB | 301.00 | 519.98 |
| GLU Total | | | | | | 456.00 | $ 1,013.19 |
| ING | 1351 | 500463 | GROUND NUTMEG 10255 | 5.13 | LB | 200.00 | 1,026.00 |
| | | 553289 | ING:SOLUBLE WHITE PE | | | | |
| | | 553741 | ING:SOULBLE NUTMEG/S | | | | |
| | | | | | | 200.00 | $ 1,026.00 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KRO | 1564 | 439002 | KRONE:GRV LM H&P 053 | 0.0135 | EA | 511,900.00 | 6,910.65 |
| | | 439007 | dnrKRONE:CHP LL CHK& | | | | |
| | | 439008 | KRONE:ROY LM CHKHAL | | | | |
| | | 439009 | KRONE:SUP LL PK E&P | 0.0164 | EA | 273,500.00 | 4,485.40 |
| | | 439012 | KRONE:CSO LM CHICKN | 0.0222 | EA | 175,200.00 | 3,889.44 |
| | | 439013 | KRONE:MRQ LM CHICKN | 0.0236 | EA | 145,000.00 | 3,422.00 |
| | | 439014 | KRONE:BRY LM H&P 534 | 0.0135 | EA | 109,450.00 | 1,477.58 |
| | | 439016 | KRONE:PIC LM CHICKN | 0.0236 | EA | 100,000.00 | 2,360.00 |
| | | 439017 | KRONE:PIC LM TKYHAL | | | | |
| | | 439021 | KRONE:LIG LM H&P 728 | 0.023 | EA | 96,100.00 | 2,210.30 |
| | | 439022 | KRONE:LIG LM H&P MX | 0.0223 | EA | 94,120.00 | 2,098.88 |
| | | 439029 | KRONE:PIC LM TURKEY | 0.0135 | EA | 111,500.00 | 1,505.25 |
| | | 439045 | KRONE:FST LM H&P 510 | 0.0236 | EA | 100,000.00 | 2,360.00 |
| | | 439046 | KRONE:FST LL CHK&PK | 0.0236 | EA | 23,000.00 | 542.80 |
| | | 439053 | KRONE:HCF LM BACNGR | | | | |
| | | 439060 | KRONE:ZYD LM CK HAL | 0.0236 | EA | 93,150.00 | 2,198.34 |
| | | 439061 | KRONE:ZYD LM TRKHAL | 0.0236 | EA | 9,300.00 | 219.48 |
| | | 439062 | dnrKRONE:ZYD CK&BF H | 0.0161 | EA | 12,750.00 | 205.28 |
| | | 439064 | dnrKRONE:CAM LM CHKH | 0.0236 | EA | 95,000.00 | 2,242.00 |
| | | 439065 | dnrKRONE:CAM LM TKYH | 0.0236 | EA | 59,000.00 | 1,392.40 |
| | | 439067 | dnrKRONE:ALH LL BF&C | 0.023 | EA | 102,000.00 | 2,346.00 |
| | | 439070 | KRONE:ALH LM TKYHAL | 0.023 | EA | 23,500.00 | 540.50 |
| | | 439078 | KRONE:CAR LM CHICKN | 0.0236 | EA | 45,500.00 | 1,073.80 |
| | | 439080 | KRONE:AMP LM CHICKN | | | | |
| | | 439083 | KRONE:LIG LM H&P JAP | 0.0236 | EA | 116,500.00 | 2,749.40 |
| | | 439094 | KRONE:AMP LM H&P 706 | | | | |
| | | 439095 | dnrKRONE:AMP LM LITE | | | | |
| | | 439099 | dnrKRONE:ACM LM H&P | 0.023 | EA | 58,000.00 | 1,334.00 |
| | | 439100 | dnrKRONE:ACM LM | 0.023 | EA | | |

| | | | | | |
|---|---|---|---|---|---|
| | LITE | | | 88,400.00 | 2,033.20 |
| 439101 | dnrKRONE:JWL LM H&P | | | | |
| 439103 | BRYAN LM 12oz KOREA | 0.0168 | EA | 82,300.00 | 1,382.64 |
| 439107 | dnrKRONE:ALH CH& BF | | | | |
| 439111 | dnrKRONE:AMP LM H&PK | | | | |
| 439112 | KRONE:AMP LM BCNGRL | 0.0236 | EA | 77,500.00 | 1,829.00 |
| 439113 | KRONE:FDL LM H&P 358 | 0.0236 | EA | 82,000.00 | 1,935.20 |
| 439115 | KRONE:UNI CK&BF HAL | 0.0121 | EA | 123,500.00 | 1,494.35 |
| 439116 | KRONE:UNI CHK HAL 19 | 0.0135 | EA | 85,000.00 | 1,147.50 |
| 439117 | KRONE:ALB LM H&P 411 | 0.0236 | EA | 37,000.00 | 873.20 |
| 439118 | KRONE:ALB LM LITE 41 | 0.0236 | EA | 89,200.00 | 2,105.12 |
| 439119 | KRONE:ACM HAM & PK L | 0.0135 | EA | 93,400.00 | 1,260.90 |
| 439120 | KRONE:ACM LIT LMT 89 | 0.0132 | EA | 96,350.00 | 1,271.82 |
| 439121 | KRONE:JWL HAM & PK L | 0.0135 | EA | 85,100.00 | 1,148.85 |
| 439127 | dnrKRONE:SHM HAM & P | 0.0236 | EA | 62,000.00 | 1,463.20 |
| 439128 | dnrKRONE:SHM CKN & P | 0.023 | EA | 43,200.00 | 993.60 |
| 439131 | KRONE:AMP BACON GRIL | 0.0236 | EA | 290,400.00 | 6,853.44 |
| 439133 | KRONE:ALH CH& BF HAL | 0.0172 | EA | 107,199.00 | 1,843.82 |
| 439137 | KRONE:LIG LL CHK&PK | 0.023 | EA | 32,740.00 | 753.02 |
| 439138 | KRONE:FLV LM H&P KOR | 0.0236 | EA | 160,000.00 | 3,776.00 |
| 439140 | KRONE:BUD LM H&P KOR | 0.0236 | EA | 52,500.00 | 1,239.00 |
| 439141 | KRONE:HCF HAM & PK L | 0.0236 | EA | 79,500.00 | 1,876.20 |
| 439142 | KRONE:HCF LLF LITE 7 | 0.0236 | EA | 75,000.00 | 1,770.00 |
| 439143 | KRONE:HCF LF W/BACN | 0.0327 | EA | 43,500.00 | 1,422.45 |
| 439144 | KRONE:HCF CKN & HAM | 0.0236 | EA | 14,500.00 | 342.20 |
| 439146 | KRONE:CKG LLF HAM & | 0.0236 | EA | 226,340.00 | 5,341.62 |
| 439151 | KRONE:AMP LM H&P KOR | 0.0236 | EA | 54,500.00 | 1,286.20 |
| KRO Total | | | | 4,535,599.00 | $ 91,006.03 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| LID | 1565 | 439997 | LID FOR 12 OZ LUNCH | 0.0464 | EA | 696,600.00 | 32,322.24 |
| WRP | 1586 | 440000 | 16" FLATX .003 POLYS | 39.7542 | RL | 145.00 | 5,764.36 |
| POD | 1564 | 439902 | DIAGRAPH 4 x 13 | 0.0489 | EA | 2,367.51 | 115.77 |
| Grand Total | | | | | | | $ 793,560.08 |

Equipment

| Description | Manufacturer | Model | S/N |
|---|---|---|---|
| Dumper, tilt vat | Friesens | | |
| Metal Detector 4"apature | Safeline | Mini 150 100300 | 50912 |
| Combo Vac | Marlin | | |
| Codedater, thermal ink-jet | Linx | 6200-3LSS | LP MC 0118009 |
| Basket Unloader, | ITC | | |
| Lifting Table, Packaging | Jorgensen Engineering | | 62215/1 |
| Can Distributor, | Jorgensen Engineering | | 62881-998-06 |
| Depalletizer, | Jorgensen Engineering | | 62211/3-956-01 |
| Metal Detector, 79MM Dia Search-Head | Detectronic | D5050 115 | 244 |
| Can Seamer, #2 | PLM Haustrup | FMC 226 | 406 |
| Can Washer, w/Rotary Filter | Jorgensen Engineering | | |
| Basket Loader, | ITC | | |
| Lifting Table, | Jorgensen Engineering | | 6221812 |
| Retort, Steam Cooker 1300MM | All-Pax | | 8735 |
| Meat Dumper, | Danfotech | HH1000 | 700 |
| Retort Lift, | All-Pax | C | 361358 |
| Vacuum Cleaner, Jet Blast | Jorgensen Engineering | | |
| Vacuum Pump, Rotary Type | Beach Russ | 128 | |
| Tipper / Drainer for cans | Metalcraft | | |
| Retort, cooker 52"D 5 basket capacity | ALL-PAX | 52S15S.5C1 | |
| Seamer, vacuum 8/12 oz cans | PLM Haustrup | Cameron-FMC22 | 1646 |
| Vacuum pump, rotary type #2 | Beach Russ | 250 | 1060-REP |
| Filler, Can | Langen | V-58 | 2314 |
| Conveyor, filler to seamers #1 | Glud & Marstrand | | |
| Conveyor, seamers to washer #2 | Glud & Marstrand | | |
| Conveyor, wash mach.to loader #3 | Glud & Marstrand | | |
| Code-Dater, Thermal Ink Jet Single Print Head | Linx / Diagraph Inc. | 6200 | LP70887 |
| Codedater, thermal ink-jet | Linx | 6200-3LSS | LP73291-LH82735 |
| Warehouse shrink wrap machine | Ultra Labeling Systems | DL-60A-2P | 161451 |
| Codedater, ink-jet 1 printhead | Linx | 6200-4LSS | MC0027028-LH77018 |
| Labeler | Krones | 745-A06 | |

| Conveyor system | Jorgenson | | |
|---|---|---|---|
| Tray Former | WexXar | ATH | 2467 |
| Heat Tunnel machine, | ARPAC | 55-24T | 2013 |
| Pallet Lift, Hydraulic Scissor 2500Lb Cap | Apache Stainless Equip | EZL2500 | 4067-10 |
| Film Wrapping machine, | Doboy Packaging Equip | SW60WS | 854256 |
| Case Stacker, | IPS Packaging | | 8104/IP44 |
| Case Packer, | Doboy Packaging Equip | TP25 | 854704 |
| Control Board, Panel | Doboy Packaging Equip | SW60WS | 854256 |
| Pallet Lifter, | Presto | WP60-10-MOD | 61294 |
| Gluer, Box Former | Nordson | X1VG | AA86C9811 |
| Conveyor,  Roller End of Packaging Line | Jorgensen Engineering | | 57306/1 |
| 7 oz. Change over Parts - Filler | | | |
| Filler Compensator | | | |
| Bowl Cutter - not operating (needs new drive motor) | | VSM 500 | 288/116 |
| Baskets | | | |
| Metop Height Guage | | | 101363 |
| Metop Height Guage | | | 101364 |
| Metop Width Guage | | | 101346 |
| Metop Thickness Guage | | | 101362 |
| Metop Video Seam Monitor | | VSM-6 | 101320 |
| Metop Seam Computer | | SCO-2 | 101582 |
| Phillips Video Monitor | | | CM3100002 |
| Samsung SyncMaster Flat Screen Monitor | | 152N S M | NB15H9NX300145 E |
| Sylvac Guage Interface | | Z40A | 90255 |
| Metop Seam Saw | | MSS-2 | 101328 |
| Incubator | | | |

Intellectual Property

Bacon Grill™ (U.S. Registration No. 2,071,608; Canadian Registration No. 508,701)
American Pride™ (Seller's common law rights)

Book of Business

Book of business for customers of Seller's canned luncheon meats' line

Recipes, Kitchen Processes, and related know-how

I. PRODUCT-BRAND: 540378-0024; WIP Chicken Luncheon Meat Canned, 2112/12 oz.

BRAND: WIP/CMBO
MINOR LINE: 437 PF PORK W-J-P
SELL GROUP: FOOD SERVICE

## ** GENERAL INFORMATION **

* DESCRIPTION *

WIP Chicken Luncheon Meat Canned, 2112/12 oz.
Houston in plant code is 40378.

* COMPUTER NAME is WIP CKN LMT CND 12 OZ

* CATEGORIES *

    FC
    POULTRY
    PREPARED FOODS

* UPCs *

  000-70606-03015 2

* INGREDIENT STATEMENT *

Ingredients: Mechanically separated chicken, salt, sugar, sodium tripolyphosphate, spices, water, sodium erythorbate, sodium nitrite.

* COOKING INSTRUCTIONS *


* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1460 days

STORAGE METHOD: Shelf Stable

STORAGE INSTRUCTIONS:

Code date with Julian date.

* LABEL REQUIREMENTS *

Label is required. No information is available.


* PIECE/PACK INFORMATION *

2112/12.0000 OZ CAN(s) per Case.

\* METHOD OF PACKAGING \*

\* WEIGHTS \*

INNER PACKAGE NET WT(US):    12.0000 OZ
INNER PACKAGE NET WT(Metric): 340.1943 GM

MASTER CASE NET WEIGHT(lbs): 1584.0000
PACKAGE TARE WEIGHT(lbs):    0.0000
GROSS WEIGHT(lbs):      1584.0000

MASTER CASE NET WEIGHT(kg):  718.5024
PACKAGE TARE WEIGHT(kg):    0.0845
GROSS WEIGHT(kg):      718.5869

NOTE:  Tare weights are a guide, each plant should determine its own tares.

\* WEIGHT INDICATOR is Standard weight

## ** NUTRITIONAL INFORMATION **

### NUTRITION FACTS

Serving Size: 2 oz. SERVING  (56g)
Servings Per Container: 6

| Amount Per Serving | | |
|---|---|---|
| Calories 100 | Calories from Fat  70 | |

| | %Daily Values | |
|---|---|---|
| Total Fat | 8 g | 12 % |
|   Saturated Fat | 2.5 g | 13 % |
|   Trans Fat | 0 g | |
|   Polyunsaturated Fat | 1.5 g | |
|   Monounsaturated Fat | 4 g | |
| Cholesterol | 60 mg | 20 % |
| Sodium | 550 mg | 23 % |
| Total Carbohydrate | 1 g | 0 % |
|   Dietary Fiber | 0 g | 0 % |
|   Sugars | 0 g | |
| Protein | 7 g | 14 % |

| | | | |
|---|---|---|---|
| Vitamin A | 0 % | Vitamin C | 10 % |
| Calcium | 6 % | Iron | 4 % |

** INGREDIENTS **

* WIPs *

   8362-0928  MSC CKN 0-15% FR CURE

* COOKING INGREDIENTS *

CI 110080

Used as: CURE INGR

Description: SODIUM ERYTHORBATE

   Approved Manufacturers:

   J.M. SWANK
   A.M.C. CHEMICALS, U.S.A.

   Ingredient Statement:

   Sodium erythorbate.

CI 56928

Used as: COOKING INGR

Description: SSNG,PCNC CKN

   Approved Manufacturers:

   NEWLYWEDS              G32466

   Ingredient Statement:

   Sugar, sodium tripolyphosphate (38.10%), spice.

             ** FORMULAS **

Cure Formula  Sodium Erythorbate 10% Solutio

            WATER                90.0000%
CI   110080    SODIUM ERYTHORBATE        10.0000%
                        TOTAL 100.0000%

Combine (generic)  10378319 Formula

WIP  8362-0928  MSC CKN 0-15% FR CURE        98.1836%
CI   56928      SSNG,PCNC CKN            01.2960%
FMU          Sodium Erythorbate 10% Solution   00.5204%

TOTAL 100.0000%

** PROCESSING PROCEDURES **

* PRODUCTION DETAIL *

1. Add mechanically separated chicken to mixer.
2. Mix phosphates with water in brine mixing tank then add to mixer.
3. Add dry ingredients to mixer.  Calculate nitrite PPM (CCP1).  Total nitrite should be 150 - 156 PPM.
4. Mix for 20 minutes under full vacuum (27" hg minimum).
5. Transfer to stainless steel vats for canning.

* PRECOOK PACKAGING PROCEDURES *

Filling Instructions

1. Feed clean empty cans to the filling machine.
2. Transfer meat into the hopper, start the filler.
3. Transfer meat through metal detector which is set to detect:
   a. 1.5 mm Ferrous
   b. 3.0 mm Non-Ferrous
   c. 4.0 Stainless
4. Verify that the weight of the product in cans is correct (filled can must be between .870 and .880 lbs).
5. Verify that the seam has been done properly.
6. When passing through the seamer, vacuum must be set at minimum of 500 millibars (20 inches mercury).
   a. Exceptions must be authorized by Plant Manager or R&D.
7. Print the following information on one line on the bottom of the gold can.

   Item#   Cook#   Est. P7220A   AY 0Julian Date

8. Load filled cans into baskets for cooking.
9. At start up cook one can to verify proper filling.

* COOKING DETAIL *

1. Load retort with 5 baskets (you can cook less).
2. Determine IT (initial temperature) of the product in a can of product taken from the last basket.  Record temperature on retort log.
3. Start retort and wait 7 minutes for the come up vent to close.
4. When vent is closed wait another 8 minutes for the temperature to rise to 235°F then cooking will start.
5. 5 minutes after the cook has started write down the MIG temperature and the chart temperature.
6. Total cook time is based upon initial temperature.  (See required cook time posted on scheduled process).
7. 5 minutes before the cook has completed write down the MIG temperature and chart temperature.
8. When the cook has completed, the cooling cycle will start.

9.  Total cooling time is 30 minutes.
10.  After cooling the retort will start draining; this takes between 7 to 12 minutes.
11.  After draining, open the retort and remove the baskets. Take temperature of the product. Temperature should be </= 100°F.
12.  After the baskets have been removed, use the lift to drain the water off of them; this prevents the rust on top of the cans.

II.  PRODUCT-BRAND: 540381-0024; WIP Chicken, Ham and Bacon Luncheon Loaf Canned, 2112/12 oz.

BRAND: WIP/CMBO
MINOR LINE: 437 PF PORK W-I-P
SELL GROUP: FOOD SERVICE

## ** GENERAL INFORMATION **

* DESCRIPTION *

WIP Chicken, Ham and Bacon Luncheon Loaf Canned, 2112/12 oz.
Houston in plant code is 40381.

* COMPUTER NAME is WIP CKN HAM BACN LF CND

* CATEGORIES *

    FC
    PORK
    POULTRY
    PREPARED FOODS

* UPCs *

    900-70606-03600 3

* INGREDIENT STATEMENT *

Ingredients:  Mechanically separated chicken, water, ham, salt, bacon (cured with water, salt, sugar, sodium phosphate, sodium erythorbate, sodium nitrite), modified corn starch, corn starch, sugar, brown sugar, sodium phosphate, corn syrup solids, sodium erythorbate, smoke flavoring, sodium nitrite.

* COOKING INSTRUCTIONS *

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1460  days

STORAGE METHOD: Shelf Stable

STORAGE INSTRUCTIONS:

Code date with Julian date.

\* LABEL REQUIREMENTS \*

Label is required. No information is available.

\* PIECE/PACK INFORMATION \*

2112/12.0000 OZ CAN(s) per Case.

\* METHOD OF PACKAGING \*

\* WEIGHTS \*

    INNER PACKAGE NET WT(US):    12.0000 OZ
    INNER PACKAGE NET WT(Metric): 340.1943 GM

    MASTER CASE NET WEIGHT(lbs): 1584.0000
    PACKAGE TARE WEIGHT(lbs):    0.0000
    GROSS WEIGHT(lbs):    1584.0000

    MASTER CASE NET WEIGHT(kg):  718.5024
    PACKAGE TARE WEIGHT(kg):    0.0845
    GROSS WEIGHT(kg):    718.5869

NOTE: Tare weights are a guide, each plant should determine its own tares.

\* WEIGHT INDICATOR is Standard weight

    \*\* NUTRITIONAL INFORMATION \*\*

    NUTRITION FACTS

Serving Size: 2 OZ. SERVING (56g)
Servings Per Container: 6

| Amount Per Serving | |
| --- | --- |
| Calories 110 | Calories from Fat 60 |

| | %Daily Values | |
| --- | --- | --- |
| Total Fat | 7 g | 11 % |
|   Saturated Fat | 2 g | 10 % |
|   Trans Fat | 0 g | |
|   Polyunsaturated Fat | 1.5 g | |
|   Monounsaturated Fat | 3 g | |
| Cholesterol | 45 mg | 15 % |
| Sodium | 520 mg | 22 % |
| Total Carbohydrate | 4 g | 1 % |
|   Dietary Fiber | 0 g | 0 % |
|   Sugars | 1 g | |

| Protein | 8 g | 16 % |
|---|---|---|

| | | |
|---|---|---|
| Vitamin A    0 % | Vitamin C    0 % | |
| Calcium       0 % | Iron   4 % | |

** INGREDIENTS **

* WIPs *

    8362-0928  MSC CKN 0-15% FR CURE

   793008-0024  72 HAM TRM

   403250-0616  WRGHT FC BACN PCE 2/5

* COOKING INGREDIENTS *

CI  110080

Used as: CURE INGR

Description: SODIUM ERYTHORBATE

   Approved Manufacturers:

   J.M. SWANK
   A.M.C. CHEMICALS, U.S.A.

   Ingredient Statement:

   Sodium erythorbate.

CI  45735

Used as: COOKING INGR

Description: STARCH,CORN,MODIFIED  POLARTEX05735

   Approved Manufacturers:

   CARGILL                    05735

   Ingredient Statement:

   Modified corn starch.

CI  43420

Used as: COOKING INGR

Description: STARCH,CORN,NATIVE  CARG. GEL 03420

CI  43420 (continued)

Approved Manufacturers:

CARGILL            03420

Ingredient Statement:

Corn starch.

CI  80009

Used as: COOKING INGR

Description: SUGAR,GRANULATED,EXTRA FINE

Approved Manufacturers:

ECONOMY CASH & CARRY
ROHTSTEIN CORP.
IMPERIAL HOLLY CORPORATION
C AND H SUGAR CO
WESTERN SUGAR CO            WSC001/C03
FLORIDA CRYSTALS
SAVANNAH FOODS            84-03-1091
J.M. SWANK
IMPERIAL SUGAR COMPANY
DOMINO SUGAR
UNITED SUGARS

Ingredient Statement:

Sugar, fine granulated.

CI  80014

Used as: COOKING INGR

Description: SUGAR,BROWN,LIGHT

Approved Manufacturers:

AMALGAMATED SUGAR CO
SWEETNER SUPPLY
IMPERIAL HOLLY CORPORATION
CHICAGO SWEETNERS
J.M. SWANK

CI  80014 (continued)

# EXHIBIT A-2

IMPERIAL SUGAR COMPANY
DOMINO SUGAR

Ingredient Statement:

Light brown sugar.

Label - brown sugar

CI 50006

Used as: COOKING INGR

Description: SALT, HIGH PURITY

Approved Manufacturers:

US SALT CO.              Superior TX-10
AKZO NOBEL               YPS
CARGILL                  Top-Flo
J.M. SWANK
MORTON INTERNATIONAL     TFC 999
UNITED SALT CORPORATION  USC Tru-Flo

Ingredient Statement:

Sodium chloride
Label -
Salt

CI 112018

Used as: COOKING INGR

Description: PHOSPHATE,ABASTOL 2018

Approved Manufacturers:

GALLARD-SCHLESINGER INDUSTRIES  FN 01-018

Ingredient Statement:

Sodium phosphates.

CI 80002

Used as: COOKING INGR

Description: CORN SYRUP, HIGH FRUCTOSE

Approved Manufacturers:

GATEWAY FOOD PROD.
STALEY              STAR-DRI 42C
ROQUETTE              143
AMERICAN MAIZE PRODUCTS

Ingredient Statement:

High fructose corn syrup.

CI  51120

Used as: COOKING INGR

Description: FLAVORING, LIQUID SMOKE, P-50

Approved Manufacturers:

HELLER SEASONING          AroSmoke P-50
RED ARROW PRODUCTS          AroSmoke P-50

Ingredient Statement:

Natural hickory smoke flavor and polysorbate 80.

CI  50091

Used as: COOKING INGR

Description: CURE, PRAGUE POWDER,SINGLE STRENGTH

Approved Manufacturers:

NEWLYWEDS              G1EB2

Ingredient Statement:

Salt (93.4% +/- 1.0%), sodium nitrite (6.25%),
propylene glycol, FD&C Red #40 (0.00099%).

CI  50091 (continued)

INGREDIENT STATEMENT:
Salt, sodium nitrite.

** FORMULAS **

Cure Formula  Sodium Erythorbate 10% Solutio

|  | WATER | 90.0000% |
|---|---|---|
| CI  110080 | SODIUM ERYTHORBATE | 10.0000% |

TOTAL 100.0000%

Combine (generic) 10381500 Formula

| | | | |
|---|---|---|---|
| WIP | 8362-0928 | MSC CKN 0-15% FR CURE | 75.0206% |
| | | WATER 09.4423% | |
| WIP | 793008-0024 | 72 HAM TRM | 06.2576% |
| WIP | 403250-0616 | WRGHT FC BACN PCE 2/5 | 01.9500% |
| CI | 45735 | STARCH,CORN,MODIFIED POLARTEX05735 | 01.9476% |
| CI | 43420 | STARCH,CORN,NATIVE CARG. GEL 03420 | 01.7978% |
| CI | 80009 | SUGAR,GRANULATED,EXTRA FINE | 01.1486% |
| CI | 80014 | SUGAR,BROWN,LIGHT | 00.7740% |
| CI | 50006 | SALT, HIGH PURITY | 00.6159% |
| CI | 112018 | PHOSPHATE,ABASTOL 2018 | 00.4827% |
| FMU | | Sodium Erythorbate 10% Solutio | 00.4309% |
| CI | 80002 | CORN SYRUP, HIGH FRUCTOSE | 00.0749% |
| CI | 51120 | FLAVORING,LIQUID SMOKE,P-50 | 00.0415% |
| CI | 50091 | CURE, PRAGUE POWDER,SINGLE STRENGTH | 00.0156% |

TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

### * PRODUCTION DETAIL *

1. Grind Ham Trim through a 3mm hole plate and transfer to mixer.
2. Add MD Chicken, Bacon Chips and all ingredients to mixer. Calculate nitrite PPM (CCP 1). Total nitrite should be 150 - 156 PPM.
3. Mix for 20 minutes under full vacuum (27" hg minimum).
4. Transfer to stainless steel vats for canning.

### * PRECOOK PACKAGING PROCEDURES *

Filling Instructions

1. Feed clean empty cans to the filling machine.
2. Transfer meat into the hopper, start the filler.
3. Transfer meat through metal detector which is set to detect:
   a. 1.5 mm Ferrous
   b. 3.0 mm Non-Ferrous
   c. 4.0 Stainless
4. Verify that the weight of the product in cans is correct (filled can must be between .870 and .880 lbs).
5. Verify that the seam has been done properly.
6. When passing through the seamer, vacuum must be set at minimum of 500 millibars (20 inches mercury).
   a. Exceptions must be authorized by Plant Manager or R&D.
7. Print the following information on one line on the bottom of the gold can.

   Item#    Cook#    Est. 7220A    AY 0Julian Date

8. Load filled cans into baskets for cooking.

9. At start up cook one can to verify proper filling.

* COOKING DETAIL *

1. Load retort with 5 baskets (you can cook less).
2. Determine IT (initial temperature) of the product in a can of product taken from the last basket. Record temperature on retort log.
3. Start retort and wait 7 minutes for the come up vent to close.
4. When vent is closed wait another 8 minutes for the temperature to rise to 235°F then cooking will start.
5. 5 minutes after the cook has started write down the MIG temperature and the chart temperature.
6. Total cook time is based upon initial temperature. (See required cook time posted on scheduled process).
7. 5 minutes before the cook has completed write down the MIG temperature and chart temperature.
8. When the cook has completed, the cooling cycle will start.
9. Total cooling time is 30 minutes.
10. After cooling the retort will start draining; this takes between 7 to 12 minutes.
11. After draining, open the retort and remove the baskets. Take temperature of the product. Temperature should be </= 100°F.
12. After the baskets have been removed, use the lift to drain the water off of them; this prevents the rust on top of the cans.

III. PRODUCT-BRAND: 540434-0024; WIP Turkey Luncheon Meat Canned, 2112/12 oz.

BRAND: WIP/CMBO
MINOR LINE: 437 PF PORK W-I-P
SELL GROUP: FOOD SERVICE

** GENERAL INFORMATION **

* DESCRIPTION *

WIP Turkey Luncheon Meat Canned, 2112/12 oz.
Houston in plant code is 40434.

* COMPUTER NAME is WIP TKY LMT CAN 2112/12

* CATEGORIES *

   FC
   POULTRY
   PREPARED FOODS

* UPCs *

   000-70606-03021 3

* INGREDIENT STATEMENT *

Ingredients: Mechanically separated turkey, salt, sugar, sodium tripolyphosphate, pepper, sodium erythorbate, sodium nitrite.

* COOKING INSTRUCTIONS *


* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1460 days

STORAGE METHOD: Shelf Stable

STORAGE INSTRUCTIONS:

Code date with Julian date.

* LABEL REQUIREMENTS *

Label is required. No information is available.

* PIECE/PACK INFORMATION *

2112/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

* WEIGHTS *

    INNER PACKAGE NET WT(US):     12.0000 OZ
    INNER PACKAGE NET WT(Metric): 340.1943 GM

    MASTER CASE NET WEIGHT(lbs): 1584.0000
    PACKAGE TARE WEIGHT(lbs):      0.0000
    GROSS WEIGHT(lbs):          1584.0000

    MASTER CASE NET WEIGHT(kg):  718.5024
    PACKAGE TARE WEIGHT(kg):       0.0845
    GROSS WEIGHT(kg):            718.5869

NOTE: Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

        ** NUTRITIONAL INFORMATION **

        NUTRITION FACTS

Serving Size: 2 oz (56g)
Servings Per Container: 6

Amount Per Serving

Calories 110    Calories from Fat 70

|  | %Daily Values |  |
|---|---|---|
| Total Fat | 8 g | 12 % |
| Saturated Fat | 2 g | 12 % |
| Monounsaturated Fat | NA g |  |
| Cholesterol | 35 mg | 12 % |
| Sodium | 490 mg | 20 % |
| Total Carbohydrate | 1 g | 0 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 0 g |  |
| Protein | 8 g |  |

| Vitamin A | 0 % | Vitamin C | 0 % |
|---|---|---|---|
| Calcium | 0 % | Iron | 2 % |

** INGREDIENTS **

* WIPs *

890038-0024  MST 20-DN W-CURE

* COOKING INGREDIENTS *

CI 110080

Used as: CURE INGR

Description: SODIUM ERYTHORBATE

Approved Manufacturers:

J.M. SWANK
A.M.C. CHEMICALS, U.S.A.

Ingredient Statement:

Sodium erythorbate.

CI 80009

Used as: COOKING INGR

Description: SUGAR,GRANULATED,EXTRA FINE

Approved Manufacturers:

ECONOMY CASH & CARRY
ROHTSTEIN CORP.
IMPERIAL HOLLY CORPORATION
C AND H SUGAR CO

WESTERN SUGAR CO          WSC001/C03
FLORIDA CRYSTALS
SAVANNAH FOODS            84-03-1091
J.M. SWANK
IMPERIAL SUGAR COMPANY
DOMINO SUGAR
UNITED SUGARS

Ingredient Statement:

Sugar, fine granulated.

CI  80009 (continued)

CI  50006

Used as: COOKING INGR

Description: SALT, HIGH PURITY

Approved Manufacturers:

US SALT CO.              Superior TX-10
AKZO NOBEL                   YPS
CARGILL                  Top-Flo
J.M. SWANK
MORTON INTERNATIONAL         TFC 999
UNITED SALT CORPORATION      USC Tru-Flo

Ingredient Statement:

Sodium chloride
Label -
Salt

CI  110960

Used as: COOKING INGR

Description: BRIFISOL 960,POLYPHOSPHATES

Approved Manufacturers:

B.K. GIUILNI CORP.       BRIFISOL 960

Ingredient Statement:

Sodium phosphate.

CI  50003

Used as: COOKING INGR

Description: PEPPER, WHITE    G483

Approved Manufacturers:

GRIFFITH            198569
NEWLYWEDS          H00287
CONSOLIDATED MILLS

CI 50003 (continued)

Ingredient Statement:

Ground white pepper

## ** FORMULAS **

Cure Formula  Sodium Erythorbate 10% Solutio

|  |  | WATER | 90.0000% |
|---|---|---|---|
| CI | 110080 | SODIUM ERYTHORBATE | 10.0000% |
|  |  | TOTAL 100.0000% |  |

Combine (generic)  10434213 Formula

| WIP | 890038-0024 MST 20-DN W-CURE | 97.1535% |
|---|---|---|
| CI  80009 | SUGAR,GRANULATED,EXTRA FINE | 01.2241% |
| CI  50006 | SALT, HIGH PURITY | 00.5343% |
| FMU | Sodium Erythorbate 10% Solutio | 00.5149% |
| CI  110960 | BRIFISOL 960,POLYPHOSPHATES | 00.4858% |
| CI  50003 | PEPPER, WHITE    G483 | 00.0874% |
|  | TOTAL 100.0000% |  |

## ** PROCESSING PROCEDURES **

### * PRODUCTION DETAIL *

1. Add mechanically separated turkey to mixer.
2. Mix phosphates with water in brine mixing tank then add to mixer.
3. Add dry ingredients to mixer.  Calculate nitrite PPM (CCP1).  Total nitrite should be 150 - 156 PPM.
4. Mix for 20 minutes under full vacuum (27" hg minimum).
5. Transfer to stainless steel vats for canning.

### * PRECOOK PACKAGING PROCEDURES *

Filling Instructions

1. Feed clean empty cans to the filling machine.

2. Transfer meat into the hopper, start the filler.
3. Transfer meat through metal detector which is set to detect:
   a. 1.5 mm Ferrous
   b. 3.0 mm Non-Ferrous
   c. 4.0 Stainless
4. Verify that the weight of the product in cans is correct (filled can must be between .870 and .880 lbs).
5. Verify that the seam has been done properly.
6. When passing through the seamer, vacuum must be set at minimum of 500 millibars (20 inches mercury).
   a. Exceptions must be authorized by Plant Manager or R&D.
7. Print the following information on one line on the bottom of the gold can.

   Item#   Cook#   Est. P7220A   AY 0Julian Date

8. Load filled cans into baskets for cooking.
9. At start up cook one can to verify proper filling.

* COOKING DETAIL *

1. Load retort with 5 baskets (you can cook less).
2. Determine IT (initial temperature) of the product in a can of product taken from the last basket. Record temperature on retort log.
3. Start retort and wait 7 minutes for the come up vent to close.
4. When vent is closed wait another 8 minutes for the temperature to rise to 235°F then cooking will start.
5. 5 minutes after the cook has started write down the MIG temperature and the chart temperature.
6. Total cook time is based upon initial temperature. (See required cook time posted on scheduled process).
7. 5 minutes before the cook has completed write down the MIG temperature and chart temperature.
8. When the cook has completed, the cooling cycle will start.
9. Total cooling time is 30 minutes.
10. After cooling the retort will start draining; this takes between 7 to 12 minutes.
11. After draining, open the retort and remove the baskets. Take temperature of the product. Temperature should be </= 100°F.
12. After the baskets have been removed, use the lift to drain the water off of them; this prevents the rust on top of the cans.

IV. PRODUCT-BRAND: 540464-0024; WIP Chicken Halal Luncheon Meat Canned, 2112/12 oz.

BRAND: WIP/CMBO
MINOR LINE: 437 PF PORK W-I-P
SELL GROUP: FOOD SERVICE

** GENERAL INFORMATION **

* DESCRIPTION *

WIP Chicken Halal Luncheon Meat Canned, 2112/12 oz.
Houston in plant code is 40464.

* COMPUTER NAME is WIP CKN HLAL LMT CAN 12

* CATEGORIES *

    FC
    HALAL
    POULTRY
    PREPARED FOODS

* UPCs *

  000-70606-03025 1

* INGREDIENT STATEMENT *

Ingredients:  Mechanically separated chicken, salt, sugar, sodium
tripolyphosphate, spices, water, sodium erythorbate, sodium
nitrite.

* COOKING INSTRUCTIONS *

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1460  days

STORAGE METHOD: Shelf Stable

STORAGE INSTRUCTIONS:

Code date with Julian date.

* LABEL REQUIREMENTS *

Label is required.  No information is available.

* PIECE/PACK INFORMATION *

2112/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

* WEIGHTS *

    INNER PACKAGE NET WT(US):    12.0000 OZ
    INNER PACKAGE NET WT(Metric): 340.1943 GM

    MASTER CASE NET WEIGHT(lbs): 1584.0000

PACKAGE TARE WEIGHT(lbs):    0.0000
GROSS WEIGHT(lbs):      1584.0000

MASTER CASE NET WEIGHT(kg):  718.5024
PACKAGE TARE WEIGHT(kg):    0.0845
GROSS WEIGHT(kg):      718.5869

NOTE:  Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

** NUTRITIONAL INFORMATION **

NUTRITION FACTS

Serving Size: 2 oz. SERVING  (56g)
Servings Per Container: 6

---

Amount Per Serving
Calories 100      Calories from Fat  70

---

| | %Daily Values | |
|---|---|---|
| Total Fat | 8 g | 12 % |
| Saturated Fat | 2.5 g | 13 % |
| Trans Fat | 0 g | |
| Polyunsaturated Fat | 1.5 g | |
| Monounsaturated Fat | 4 g | |
| Cholesterol | 60 mg | 20 % |
| Sodium | 550 mg | 23 % |
| Total Carbohydrate | 1 g | 0 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 0 g | |
| Protein | 7 g | 14 % |

---

| | | |
|---|---|---|
| Vitamin A | 0 % | Vitamin C  10 % |
| Calcium | 6 % | Iron  4 % |

** INGREDIENTS **

* WIPs *

    9250-0001  MSC CKN - 15% FR CURE

* COOKING INGREDIENTS *

    CI  110080

Used as: CURE INGR

Description: SODIUM ERYTHORBATE

Approved Manufacturers:

J.M. SWANK
A.M.C. CHEMICALS, U.S.A.

Ingredient Statement:

Sodium erythorbate.

CI 56928

Used as: COOKING INGR

Description: SSNG,PCNC CKN

Approved Manufacturers:

NEWLYWEDS          G32466

Ingredient Statement:

Sugar, sodium tripolyphosphate (38.10%), spice.

CI 50006

Used as: COOKING INGR

Description: SALT, HIGH PURITY

Approved Manufacturers:

US SALT CO.          Superior TX-10

CI 50006 (continued)

AKZO NOBEL          YPS
CARGILL             Top-Flo
J.M. SWANK
MORTON INTERNATIONAL        TFC 999
UNITED SALT CORPORATION      USC Tru-Flo

Ingredient Statement:

Sodium chloride
Label -
Salt

## ** FORMULAS **

Cure Formula  Sodium Erythorbate 10% Solutio

|  | WATER | 90.0000% |  |
|---|---|---|---|
| CI | 110080 | SODIUM ERYTHORBATE | 10.0000% |
|  |  | TOTAL 100.0000% |  |

Combine (generic)  10464318 Formula

| WIP | 9250-0001 | MSC CKN - 15% FR CURE | 97.8953% |
|---|---|---|---|
| CI | 56928 | SSNG,PCNC CKN | 00.9398% |
| CI | 50006 | SALT, HIGH PURITY | 00.7734% |
| FMU |  | Sodium Erythorbate 10% Solutio | 00.3915% |
|  |  | TOTAL 100.0000% |  |

## ** PROCESSING PROCEDURES **

### * PRODUCTION DETAIL *

Note:  This product is HALAL and should be run at on first cook
or after a wash down.

1. Add mechanically separated chicken to mixer.
2. Mix phosphates with water in brine mixing tank then add to mixer.
3. Add dry ingredients to mixer.
4. Mix for 20 minutes under full vacuum (27" hg minimum).
5. Transfer to stainless steel vats for canning.

### * PRECOOK PACKAGING PROCEDURES *

Filling Instructions

Note:  This product is HALAL and should be run at on first cook or after a wash down.

1. Feed clean empty cans to the filling machine.
2. Transfer meat into the hopper, start the filler.
3. Transfer meat through metal detector which is set to detect:
   a. 1.5 mm Ferrous
   b. 3.0 mm Non-Ferrous
   c. 4.0 Stainless
4. Verify that the weight of the product in cans is correct (filled can must be between .870 and .880 lbs).
5. Verify that the seam has been done properly.
6. When passing through the seamer, vacuum must be set at minimum of 500 millibars (20 inches mercury).
   a. Exceptions must be authorized by Plant Manager or R&D.
7. Print the following information on one line on the bottom of the gold can.

Item#   Cook#   Est. P7220A   AY 0Julian Date

8. Load filled cans into baskets for cooking.
9. At start up cook one can to verify proper filling.

* COOKING DETAIL *

1. Load retort with 5 baskets (you can cook less).
2. Determine IT (initial temperature) of the product in a can of product taken from the last basket. Record temperature on retort log.
3. Start retort and wait 7 minutes for the come up vent to close.
4. When vent is closed wait another 8 minutes for the temperature to rise to 235°F, then cooking will start.
5. 5 minutes after the cook has started write down the MIG temperature and the chart temperature on the log report. The MIG and the recorders chart should agree within ± 1°F. If not, immediately notify supervisor and QA.
6. Total cook time is based upon initial temperature. (See required cook time posted on scheduled process).
7. 5 minutes before the cook has completed record down the MIG temperature and chart temperature on the retort log.
8. When the cook has completed, the cooling cycle will start.
9. Total cooling time is 30 minutes.
10. After cooling the retort will start draining; this takes between 7 to 12 minutes.
11. After draining, open the retort and remove the baskets. Take temperature of the product. Temperature should be </= 100°F.
12. After the baskets have been removed, use the lift to drain the water off of them; this prevents the rust on top of the cans.

V. PRODUCT-BRAND: 540474-0024; WIP Turkey Halal Luncheon Meat Canned, 2112/12 oz.

BRAND: WIP/CMBO
MINOR LINE: 437 PF PORK W-I-P
SELL GROUP: FOOD SERVICE

** GENERAL INFORMATION **

* DESCRIPTION *

WIP Turkey Halal Luncheon Meat Canned, 2112/12 oz.
Houston in plant code is 40474.

* COMPUTER NAME is WIP TKY HLAL LMT CND 12

* CATEGORIES *

FC
HALAL
POULTRY
PREPARED FOODS

* UPCs *

000-70606-03022 0

* INGREDIENT STATEMENT *

Ingredients: Mechanically separated turkey, salt, sugar, sodium tripolyphosphate, pepper, sodium erythorbate, sodium nitrite.

* COOKING INSTRUCTIONS *

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1460 days

STORAGE METHOD: Shelf Stable

STORAGE INSTRUCTIONS:

Code date with Julian date.

* LABEL REQUIREMENTS *

Label is required. No information is available.

* PIECE/PACK INFORMATION *

2112/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

* WEIGHTS *

   INNER PACKAGE NET WT(US):     12.0000 OZ
   INNER PACKAGE NET WT(Metric): 340.1943 GM

   MASTER CASE NET WEIGHT(lbs): 1584.0000
   PACKAGE TARE WEIGHT(lbs):        0.0000
   GROSS WEIGHT(lbs):          1584.0000

   MASTER CASE NET WEIGHT(kg):  718.5024
   PACKAGE TARE WEIGHT(kg):       0.0845
   GROSS WEIGHT(kg):           718.5869

NOTE: Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

     ** NUTRITIONAL INFORMATION **

     NUTRITION FACTS

Serving Size: 2 oz (56g)
Servings Per Container: 6

| Amount Per Serving | | |
|---|---|---|
| Calories 110 | Calories from Fat | 70 |

| | %Daily Values | |
|---|---|---|
| Total Fat | 8 g | 12 % |
| Saturated Fat | 2 g | 12 % |
| Monounsaturated Fat | NA g | |
| Cholesterol | 35 mg | 12 % |
| Sodium | 490 mg | 20 % |
| Total Carbohydrate | 1 g | 0 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 0 g | |
| Protein | 8 g | |

| | | | |
|---|---|---|---|
| Vitamin A | 0 % | Vitamin C | 0 % |
| Calcium | 0 % | Iron | 2 % |

## ** INGREDIENTS **

* WIPs *

890157-0024  MST 20-DN W-CURE HLAL

* COOKING INGREDIENTS *

Cl  110080

Used as: CURE INGR

Description: SODIUM ERYTHORBATE

Approved Manufacturers:

J.M. SWANK
A.M.C. CHEMICALS, U.S.A.

Ingredient Statement:

Sodium erythorbate.

CI  80009

Used as: COOKING INGR

Description: SUGAR,GRANULATED,EXTRA FINE

Approved Manufacturers:

ECONOMY CASH & CARRY
ROHTSTEIN CORP.

IMPERIAL HOLLY CORPORATION
C AND H SUGAR CO
WESTERN SUGAR CO          WSC001/C03
FLORIDA CRYSTALS
SAVANNAH FOODS            84-03-1091
J.M. SWANK
IMPERIAL SUGAR COMPANY
DOMINO SUGAR
UNITED SUGARS

Ingredient Statement:

Sugar, fine granulated.

CI  80009 (continued)

CI  110960

Used as: COOKING INGR

Description: BRIFISOL 960,POLYPHOSPHATES

Approved Manufacturers:

B.K. GIUILNI CORP.        BRIFISOL 960

Ingredient Statement:

Sodium phosphate.

CI  50006

Used as: COOKING INGR

Description: SALT, HIGH PURITY

Approved Manufacturers:

US SALT CO.        Superior TX-10
AKZO NOBEL              YPS
CARGILL            Top-Flo
J.M. SWANK
MORTON INTERNATIONAL    TFC 999
UNITED SALT CORPORATION    USC Tru-Flo

Ingredient Statement:

Sodium chloride
Label -
Salt

CI 50003

Used as: COOKING INGR

Description: PEPPER, WHITE     G483

Approved Manufacturers:

GRIFFITH                198569
NEWLYWEDS               H00287
CONSOLIDATED MILLS

CI 50003 (continued)

Ingredient Statement:

Ground white pepper

** FORMULAS **

Cure Formula  Sodium Erythorbate 10% Solutio

|  | | WATER | 90.0000% | |
|---|---|---|---|---|
| CI | 110080 | SODIUM ERYTHORBATE | | 10.0000% |
| | | TOTAL 100.0000% | | |

Combine (generic) 10474215 Formula

| WIP | 890157-0024 MST 20-DN W-CURE HLAL | 97.4374% |
|---|---|---|
| CI | 80009    SUGAR,GRANULATED,EXTRA FINE | 01.1709% |
| FMU | Sodium Erythorbate 10% Solutio | 00.5148% |
| CI | 110960   BRIFISOL 960,POLYPHOSPHATES | 00.4774% |
| CI | 50006    SALT, HIGH PURITY | 00.3118% |
| CI | 50003    PEPPER, WHITE    G483 | 00.0877% |
| | TOTAL 100.0000% | |

** PROCESSING PROCEDURES **

* PRODUCTION DETAIL *

Note:  This product is HALAL and should be run at startup on first cook or after a wash down.

1. Add mechanically separated turkey to mixer.
2. Mix phosphates with water in brine mixing tank then transfer to mixer.
3. Add dry ingredients to mixer. Calculate nitrite PPM (CCP1).  Total nitrite should be 150 - 156 PPM.
4. Mix for 20 minutes under full vacuum (27" hg minimum).
5. Transfer to stainless steel vats for canning.

* PRECOOK PACKAGING PROCEDURES *

Filling Instructions

1. Feed clean empty cans to the filling machine.
2. Transfer meat into the hopper, start the filler.
3. Transfer meat through metal detector which is set to detect:
   a. 1.5 mm Ferrous
   b. 3.0 mm Non-Ferrous
   c. 4.0 Stainless
4. Verify that the weight of the product in cans is correct (filled can must be between .870 and .880 lbs).
5. Verify that the seam has been done properly.
6. When passing through the seamer, vacuum must be set at minimum of 500 millibars (20 inches mercury).
   a. Exceptions must be authorized by Plant Manager or R&D.
7. Print the following information on one line on the bottom of the gold can.

   Item#   Cook#   Est. P7220A   AY 0Julian Date

8. Load filled cans into baskets for cooking.
9. At start up cook one can to verify proper filling.

* COOKING DETAIL *

Note: This product is HALAL and should be run at startup on first cook or after a wash down.

1. Load retort with 5 baskets (you can cook less).
2. Determine IT (initial temperature) of the product in a can of product taken from the last basket. Record temperature on retort log.
3. Start retort and wait 7 minutes for the come up vent to close.
4. When vent is closed, wait another 8 minutes for the temperature to rise to 235°F; then cooking will start.
5. 5 minutes after the cook has started, write down the MIG temperature and the chart temperature.
6. Total cook time is based upon initial temperature. (See required cook time posted on scheduled process).
7. 5 minutes before the cook has completed, write down the MIG temperature and chart temperature.
8. When the cook has completed, the cooling cycle will start.
9. Total cooling time is 30 minutes.
10. After cooling, the retort will start draining; this takes between 7 to 12 minutes.
11. After draining, open the retort and remove the baskets. Take temperature of the product. Temperature should be </= 100°F.
12. After the baskets have been removed, use the lift to drain the water off of them; this prevents the rust on top of the cans.

VI. PRODUCT-BRAND: 540710-0024; WIP Chicken and Beef Halal Luncheon Loaf, Canned 2112/12 oz.

BRAND: WIP/CMBO
MINOR LINE: 437 PF PORK W-I-P

SELL GROUP: FOOD SERVICE

## ** GENERAL INFORMATION **

### * DESCRIPTION *

WIP Chicken and Beef Halal Luncheon Loaf, Canned 2112/12 oz.  Houston in plant code is 40710.

### * COMPUTER NAME is WIP CKN & BF HLAL LF

### * CATEGORIES *

   BEEF
   FC
   HALAL
   POULTRY
   PREPARED FOODS

### * UPCs *

   000-70606-03016 9

### * INGREDIENT STATEMENT *

Ingredients:  Mechanically separated chicken, water, beef, salt, modified corn starch, contains 2% or less of: sugar, sodium phosphates, spice, sodium erythorbate, sodium nitrite.

### * COOKING INSTRUCTIONS *

### * STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1460  days

STORAGE METHOD: Shelf Stable

STORAGE INSTRUCTIONS:

Code date with Julian date.

### * LABEL REQUIREMENTS *

Label is required.  No information is available.

### * PIECE/PACK INFORMATION *

2112/12.0000 OZ CAN(s) per Case.

### * METHOD OF PACKAGING *

### * WEIGHTS *

INNER PACKAGE NET WT(US):      12.0000 OZ
INNER PACKAGE NET WT(Metric): 340.1943 GM

MASTER CASE NET WEIGHT(lbs): 1584.0000
PACKAGE TARE WEIGHT(lbs):        0.0000
GROSS WEIGHT(lbs):            1584.0000

MASTER CASE NET WEIGHT(kg):   718.5024
PACKAGE TARE WEIGHT(kg):        0.0845
GROSS WEIGHT(kg):             718.5869

NOTE: Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

NUTRITION FACTS

Serving Size: 2 oz. SERVING  (56g)
Servings Per Container: 6

Amount Per Serving
Calories 90      Calories from Fat  60

|  | %Daily Values |  |
|---|---|---|
| Total Fat | 6 g | 9 % |
| Saturated Fat | 2.5 g | 13 % |
| Trans Fat | 0 g | |
| Polyunsaturated Fat | 1 g | |
| Monounsaturated Fat | 3 g | |
| Cholesterol | 40 mg | 13 % |
| Sodium | 640 mg | 27 % |
| Total Carbohydrate | 3 g | 1 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 0 g | |
| Protein | 6 g | 12 % |

| Vitamin A | 0 % | Vitamin C | 0 % |
|---|---|---|---|
| Calcium | 6 % | Iron | 4 % |

** INGREDIENTS **

* WIPs *

    9250-0001  MSC CKN - 15% FR CURE

    690355-0034  BF 75 TRM HLAL

* COOKING INGREDIENTS *

CI 110080

Used as: CURE INGR

Description: SODIUM ERYTHORBATE

    Approved Manufacturers:

    J.M. SWANK
    A.M.C. CHEMICALS, U.S.A.

    Ingredient Statement:

    Sodium erythorbate.

CI 45735

Used as: COOKING INGR

Description: STARCH,CORN,MODIFIED  POLARTEX05735

    Approved Manufacturers:

    CARGILL          05735

    Ingredient Statement:

    Modified corn starch.

CI 50006

Used as: COOKING INGR

Description: SALT, HIGH PURITY

    Approved Manufacturers:

CI 50006 (continued)

| | |
|---|---|
| US SALT CO. | Superior TX-10 |
| AKZO NOBEL | YPS |
| CARGILL | Top-Flo |
| J.M. SWANK | |
| MORTON INTERNATIONAL | TFC 999 |
| UNITED SALT CORPORATION | USC Tru-Flo |

    Ingredient Statement:

    Sodium chloride
    Label -

Salt

CI 80009

Used as: COOKING INGR

Description: SUGAR,GRANULATED,EXTRA FINE

Approved Manufacturers:

ECONOMY CASH & CARRY
ROHTSTEIN CORP.
IMPERIAL HOLLY CORPORATION
C AND H SUGAR CO
WESTERN SUGAR CO          WSC001/C03
FLORIDA CRYSTALS
SAVANNAH FOODS           84-03-1091
J.M. SWANK
IMPERIAL SUGAR COMPANY
DOMINO SUGAR
UNITED SUGARS

Ingredient Statement:

Sugar, fine granulated.

CI 110960

Used as: COOKING INGR

Description: BRIFISOL 960,POLYPHOSPHATES

Approved Manufacturers:

CI 110960 (continued)

B.K. GIUILNI CORP.          BRIFISOL 960

Ingredient Statement:

Sodium phosphate.

CI 50048

Used as: COOKING INGR

Description: NUTMEG,GROUND

Approved Manufacturers:

BALTIMORE SPICE           NUT2031

GRIFFITH                  019-0558
NEWLYWEDS                 H00239
DIVERSITECH, INC.
SPICETEC                  2-3710
ATLAS FOODS
CONSOLIDATED MILLS

Ingredient Statement:

Ground nutmeg

CI 50091

Used as: COOKING INGR

Description: CURE, PRAGUE POWDER,SINGLE STRENGTH

Approved Manufacturers:

NEWLYWEDS                 G1EB2

Ingredient Statement:

Salt (93.4% +/- 1.0%), sodium nitrite (6.25%),
propylene glycol, FD&C Red #40 (0.00099%).

INGREDIENT STATEMENT:
Salt, sodium nitrite.

** FORMULAS **

Cure Formula  Sodium Erythorbate 10% Solutio

           WATER              90.0000%
CI   110080    SODIUM ERYTHORBATE        10.0000%
                         TOTAL 100.0000%

Combine (generic) 10710410 Formula

WIP   690355-0034 BF 75 TRM HLAL        100.0000%
                         TOTAL 100.0000%

Combine (generic) 10710308 Formula

WIP   9250-0001  MSC CKN - 15% FR CURE        60.5927%
               WATER              18.8764%
FMU          10710410 Formula        15.1482%
CI   45735    STARCH,CORN,MODIFIED  POLARTEX05735 02.2060%
CI   50006    SALT, HIGH PURITY        01.3236%
CI   80009    SUGAR,GRANULATED,EXTRA FINE        00.7353%
FMU          Sodium Erythorbate 10% Solutio        00.3897%

CI     110960     BRIFISOL 960,POLYPHOSPHATES          00.3677%
CI     50048      NUTMEG,GROUND                          00.3236%
CI     50091      CURE, PRAGUE POWDER,SINGLE STRENGTH  00.0368%
                  TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

### * PRODUCTION DETAIL *

Note:  This product is HALAL and should be run at startup on first cook or after a wash down.

1. Add Mechanically Separated Chicken to mixer.
2. Grind Beef Trim through a 4 mm hole plate and transfer to mixer.
3. Mix phosphate with water in brine mixing tank then add to mixer.
4. Add dry ingredients to mixer.  Calculate nitrite PPM (CCP1).  Total nitrite should be 150 - 156 PPM.
5. Mix for 20 minutes under full vacuum (27" hg minimum).
6. Transfer to stainless steel vats for canning.

### * PRECOOK PACKAGING PROCEDURES *

Filling Instructions

Note:  This product is HALAL and should be run at startup on first cook or after a wash down.

1. Feed clean empty cans to the filling machine.
2. Transfer meat into the hopper, start the filler.
3. Transfer meat through metal detector which is set to detect:
    a. 1.5 mm Ferrous
    b. 3.0 mm Non-Ferrous
    c. 4.0 Stainless
4. Verify that the weight of the product in cans is correct (filled can must be between .870 and .880 lbs).
5. Verify that the seam has been done properly.
6. When passing through the seamer, vacuum must be set at minimum of 500 millibars (20 inches mercury).
    a. Exceptions must be authorized by Plant Manager or R&D.
7. Print the following information on one line on the bottom of the gold can.

   Item#   Cook#   Est. 7220A   AY 0Julian Date

8. Load filled cans into baskets for cooking.
9. At start up cook one can to verify proper filling.

### * COOKING DETAIL *

1. Load retort with 5 baskets (you can cook less).
2. Determine IT (initial temperature) of the product in a can of product taken from the last basket.  Record temperature on retort log.
3. Start retort and wait 7 minutes for the come up vent to close.

4. When vent is closed wait another 8 minutes for the temperature to rise to 235°F then cooking will start.

5. 5 minutes after the cook has started write down the MIG temperature and the chart temperature.

6. Total cook time is based upon initial temperature. (See required cook time posted on scheduled process).

7. 5 minutes before the cook has completed write down the MIG temperature and chart temperature.

8. When the cook has completed, the cooling cycle will start.

9. Total cooling time is 30 minutes.

10. After cooling the retort will start draining; this takes between 7 to 12 minutes.

11. After draining, open the retort and remove the baskets. Take temperature of the product. Temperature should be </= 100°F.

12. After the baskets have been removed, use the lift to drain the water off of them; this prevents the rust on top of the cans.

VII. PRODUCT-BRAND: 241367-0984; Ham and Pork Luncheon Meat, Canned, 24/12 oz.

BRAND: GT VALUE
MINOR LINE: 576 CANNED LUNCH MEAT/HAMS
SELL GROUP: REFRIGERATED VALUE ADDED

** GENERAL INFORMATION **

* DESCRIPTION *

Great Value Ham and Pork Luncheon Meat, Canned, 24/12 oz.
Houston in plant code is 41367.

* CONSUMER NAME *

   Wal-Mart

* COMPUTER NAME is GV HAM & PK LMT CND

* CATEGORIES *

   FC
   PORK
   PREPARED FOODS

* UPCs *

   6-05388-18688 1
   106-05388-18688 8

* INGREDIENT STATEMENT *

Ingredients: Ham and pork, water, salt, sugar, sodium phosphate, spices, sodium erythorbate, sodium nitrite.

\* COOKING INSTRUCTIONS \*

\* STORAGE AND HANDLING \*

OPTIMAL SHELF LIFE: 1095 days

STORAGE METHOD: Shelf Stable

\* PIECE/PACK INFORMATION \*

24/12.0000 OZ CAN(s) per Case.

\* METHOD OF PACKAGING \*

1. Use two trays per case.
2. Use Chep pallets.
3. Cube 0.40 on 24 pack
4. Ti=20 / Hi=5

\* WEIGHTS \*

INNER PACKAGE NET WT(US):     12.0000 OZ

INNER PACKAGE NET WT(Metric): 340.1943 GM

MASTER CASE NET WEIGHT(lbs):  18.0000
MEAT TARE WEIGHT (lbs):     4.8964
PACKAGE TARE WEIGHT(lbs):    0.1036
GROSS WEIGHT(lbs):         23.0000

MASTER CASE NET WEIGHT(kg):   8.1648
MEAT TARE WEIGHT (kg):     2.2210
PACKAGE TARE WEIGHT(kg):     0.0470
GROSS WEIGHT(kg):         10.4328

NOTE: Tare weights are a guide, each plant should determine its own tares.

\* WEIGHT INDICATOR is Standard weight

\*\* NUTRITIONAL INFORMATION \*\*

NUTRITION FACTS

Serving Size: 2 oz  (56g)
Servings Per Container: 6

---

Amount Per Serving
Calories 150      Calories from Fat  120

---

%Daily Values

| | | |
|---|---|---|
| Total Fat | 13 g | 20 % |
|   Saturated Fat | 4.5 g | 23 % |
|   Trans Fat | 0 g | |
|   Polyunsaturated Fat | 1.5 g | |
|   Monounsaturated Fat | 7 g | |
| Cholesterol | 35 mg | 12 % |
| Sodium | 510 mg | 21 % |
| Total Carbohydrate | 2 g | 1 % |
|   Dietary Fiber | 2 g | 8 % |
|   Sugars | 1 g | |
| Protein | 8 g | 16 % |

| | | |
|---|---|---|
| Vitamin A | 0 % | Vitamin C  0 % |
| Calcium | 0 % | Iron  2 % |

## ** INGREDIENTS **

* WIPs *

540168-0024  WIP HAM & PK LMT CND 12

## ** FORMULAS **

Combine (generic) Formula

WIP   540168-0024 WIP HAM & PK LMT CND 12          100.0000%
TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

* DETAILED PACKAGING INSTRUCTNS *

1. Remove stretch wrap from the pallet of gold cans or remove the cans from the baskets and move to the labeling machine.
2. Cans are code dated on line 1 on top of can 36 months from production date stated on bottom of can.

Item#     Best By: MM/DD/YY

3. Apply label (s) as specified in the bill of material to the gold cans and transfer to the Doboy.
4. Manually load the trays onto the Doboy.
5. Use the Doboy to pack 12 cans per tray.  Double stack 2 trays (total of 24 cans).
6. Then shrink wrap the double stacked trays.
7. After shrink wrapping, apply a product label to each case.
8. The format for the manufacture date on the Master Case label is:

AYY 0JJJ  (Example A07 0123)

9. The date code information on the product label must match the format on the cans.  Make sure that master case label has expiration date manually entered before printing.

10. Transfer cases to a Chep pallet, stack 100 cases per pallet, 5 layers, 20 cases per layer.
11. Stretch wrap pallet for support during transportation.

## ** PRODUCT STANDARDS **

* SENSORY

   ORGANOLEPTIC
   No off odor or flavor.

VIII. PRODUCT-BRAND: 241502-0401; Luncheon Loaf, Made with Chicken & Ham, Smoke Flavor Added, Canned, 24/12 oz

BRAND: HILLCNTY
MINOR LINE: 576 CANNED LUNCH MEAT/HAMS
SELL GROUP: REFRIGERATED VALUE ADDED

## ** GENERAL INFORMATION **

* DESCRIPTION *

Hill Country Fare Luncheon Loaf, Made with Chicken & Ham, Smoke Flavor Added, Canned, 24/12 oz.
Houston in plant code is 41502.

* CONSUMER NAME *

   H. E. B.

* COMPUTER NAME is HCF CKN & HAM LNCH LF

* CATEGORIES *

   FC
   PORK
   POULTRY
   PREPARED FOODS

* UPCs *

   0-41220-31379 2
   300-41220-31379 3

* INGREDIENT STATEMENT *

Ingredients: Mechanically separated chicken, water, ham, modified corn starch, contains 2% or less of: sugar, brown sugar, salt, sodium phosphate, corn syrup, sodium erythorbate, smoke flavoring, sodium nitrite.

* COOKING INSTRUCTIONS *

FULLY COOKED & READY TO EAT.
ENJOY HOT OR COLD.

TO HEAT: Slice HILL COUNTRY FARE Luncheon Loaf and PAN FRY until browned on both sides or MICROWAVE on high for 2 1/2 to 4 minutes or BAKE at 425°F for 10-12 minutes.

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1095 days

STORAGE METHOD: Shelf Stable

* PIECE/PACK INFORMATION *

24/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

1. Use two trays per case.
2. Use Chep pallets.
3. Cube 0.40 on 24 pack
4. Ti= 20 / Hi=5

* WEIGHTS *

    INNER PACKAGE NET WT(US):    12.0000 OZ
    INNER PACKAGE NET WT(Metric): 340.1943 GM

    MASTER CASE NET WEIGHT(lbs):  18.0000
    MEAT TARE WEIGHT (lbs):       4.8964
    PACKAGE TARE WEIGHT(lbs):     0.1036
    GROSS WEIGHT(lbs):            23.0000

    MASTER CASE NET WEIGHT(kg):   8.1648
    MEAT TARE WEIGHT (kg):        2.2210
    PACKAGE TARE WEIGHT(kg):      0.0470
    GROSS WEIGHT(kg):             10.4328

NOTE: Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

        ** NUTRITIONAL INFORMATION **

        NUTRITION FACTS

Serving Size: 2 OZ. SERVING  (56g)
Servings Per Container: 6

Amount Per Serving

Calories 110     Calories from Fat  70

|  | %Daily Values |  |
|---|---|---|
| Total Fat | 8 g | 12 % |
| Saturated Fat | 2.5 g | 13 % |
| Trans Fat | 0 g |  |
| Polyunsaturated Fat | 1.5 g |  |
| Monounsaturated Fat | 4 g |  |
| Cholesterol | 50 mg | 17 % |
| Sodium | 530 mg | 22 % |
| Total Carbohydrate | 3 g | 1 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 1 g |  |
| Protein | 6 g | 12 % |

| Vitamin A | 0 % | Vitamin C | 0 % |
|---|---|---|---|
| Calcium | 4 % | Iron | 4 % |

## ** INGREDIENTS **

* WIPs *

540408-0024  WIP CKN & HAM LNCH LF

## ** FORMULAS **

Combine (generic) Formula

WIP   540408-0024 WIP CKN & HAM LNCH LF          100.0000%
                          TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

* DETAILED PACKAGING INSTRUCTNS *

1. Remove stretch wrap from the pallet of gold cans or remove the cans from the baskets and move to the labeling machine.
2. Cans are code dated on line 1 on top of can 36 months from production date stated on bottom of can.

   Item#     Best If Used By: MM/DD/YYYY

3. Apply label (s) as specified in the bill of material to the gold cans and transfer to the Doboy.
4. Manually load the trays onto the Doboy.
5. Use the Doboy to pack 12 cans per tray.  Double stack 2 trays (total of 24 cans).
6. Then shrink wrap the double stacked trays.
7. After shrink wrapping, apply a product label to each case.
8. The date code information on the product label must match the format on the cans.
9. Transfer cases to a wood pallet, stack 100 cases per pallet, 5 layers, 20 cases per layer.
10. Stretch wrap pallet for support during transportation.

IX.  PRODUCT-BRAND: 241657-0022; Lite Luncheon Meat, Made with Pork and Chicken, Canned, 24/12 oz

BRAND: ALBRTSNS
MINOR LINE: 576 CANNED LUNCH MEAT/HAMS
SELL GROUP: REFRIGERATED PROCESSED MEATS

** GENERAL INFORMATION **

* DESCRIPTION *

Albertson's Lite  Luncheon Meat, Made with Pork and Chicken, 50% Less Fat, 33% Fewer Calories Than Regular Canned Luncheon Meat, Canned, 24/12 oz.  Houston in plant code is 41657.

* CONSUMER NAME *

Albertson's

* COMPUTER NAME is ALB LITE LMT CND

* CATEGORIES *

FC
PORK
POULTRY
PREPARED FOODS

* UPCs *

0-41163-45073 8
300-41163-45073 9

* INGREDIENT STATEMENT *

Ingredients:  Ham and pork, mechanically separated chicken, water, salt, sugar, sodium phosphates, potassium chloride, sodium erythorbate, sodium nitrite.

* COOKING INSTRUCTIONS *

Albertson's light canned luncheon meat 110 calories, 8g of fat per serving.

Albertson's regular canned luncheon meat 170 calories, 16g of fat per serving.

Serving Suggestion

Broccoli Cheese Bake

1    10 oz. frozen chopped broccoli

1   10 3/4 oz. can Chedder cheese soup
1-1/2 cups sour cream
1   12 oz. Lite Luncheon Meat (cubed)
1-1/2 cups cooked rice
1/2  cups buttered bread crumbs

Preheat oven to 350°F.  Boil or steam broccoli until tender;
drain well.  In a medium bowl, combine soup and sour cream.  Add
Albertson's Lite Luncheon Meat, broccoli and rice to soup
mixture.  In a 1-1/2 qt. casserole dish, spoon in mixture and
sprinkle bread crumbs.  Bake for 30 minutes, or until thoroughly
heated.  Serves 6.

Fully Cooked * Ready to Eat * Hot or Cold

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1095  days

STORAGE METHOD: Shelf Stable

* PIECE/PACK INFORMATION *

24/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

1. Use two trays per case.
2. Cube 0.40 on 24 pack
3. Ti=20 /  Hi=5

* WEIGHTS *

    INNER PACKAGE NET WT(US):     12.0000 OZ
    INNER PACKAGE NET WT(Metric): 340.1943 GM
    MASTER CASE NET WEIGHT(lbs):  18.0000
    MEAT TARE WEIGHT (lbs):     4.8964
    PACKAGE TARE WEIGHT(lbs):    0.1036
    GROSS WEIGHT(lbs):        23.0000

    MASTER CASE NET WEIGHT(kg):   8.1648
    MEAT TARE WEIGHT (kg):      2.2210
    PACKAGE TARE WEIGHT(kg):     0.0470
    GROSS WEIGHT(kg):         10.4328

NOTE:  Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

        ** NUTRITIONAL INFORMATION **

NUTRITION FACTS

Serving Size: 2 oz (56g)
Servings Per Container: 6

Amount Per Serving
Calories 110       Calories from Fat  60

|  | %Daily Values |  |
|---|---|---|
| Total Fat | 7 g | 11 % |
| Saturated Fat | 2.5 g | 13 % |
| Trans Fat | 0 g |  |
| Polyunsaturated Fat | 1 g |  |
| Monounsaturated Fat | 3.5 g |  |
| Cholesterol | 35 mg | 12 % |
| Sodium | 580 mg | 24 % |
| Total Carbohydrate | 2 g | 1 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 1 g |  |
| Protein | 8 g | 16 % |

| Vitamin A | 0 % | Vitamin C | 0 % |
|---|---|---|---|
| Calcium | 0 % | Iron | 4 % |

## ** INGREDIENTS **

* WIPs *

540369-0024  WIP LITE HAM & PK LMT

## ** FORMULAS **

Combine (generic) Formula

WIP   540369-0024 WIP LITE HAM & PK LMT          100.0000%
                        TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

* DETAILED PACKAGING INSTRUCTNS *

1. Remove stretch wrap from the pallet of gold cans or remove the cans from the baskets and move to the labeling machine.
2. Cans are code dated on line 1 on top of can 36 months from production date stated on bottom of can.

   Item#     Best If Used By: MM/DD/YYYY

3. Apply label (s) as specified in the bill of material to the gold cans and transfer to the Doboy.
4. Manually load the trays onto the Doboy.
5. Use the Doboy to pack 12 cans per tray.  Double stack 2 trays (total of 24 cans).

6. Then shrink wrap the double stacked trays.
7. After shrink wrapping, apply a product label to each case.
8. The date code information on the product label must match the format on the cans.
9. Transfer cases to a wood pallet, stack 100 cases per pallet, 5 layers, 20 cases per layer.
10. Stretch wrap pallet for support during transportation.

X. PRODUCT-BRAND: 241882-0401; Ham and Bacon Luncheon Meat, Smoke Flavoring Added, Canned, 24/12 oz.

BRAND: HILLCNTY
MINOR LINE: 576 CANNED LUNCH MEAT/HAMS
SELL GROUP: REFRIGERATED PROCESSED MEATS

## ** GENERAL INFORMATION **

* DESCRIPTION *

Hill Country Fare Ham and Bacon Luncheon Meat, Smoke Flavoring Added, Made with Bacon, Canned, 24/12 oz.
Houston in plant code is 41882.

* CONSUMER NAME *

H. E. B.

* COMPUTER NAME is HCF BACN GRL LMT CND

* CATEGORIES *

FC
PORK
PREPARED FOODS

* UPCs *

0-41220-79907 7
300-41220-79907 8

* INGREDIENT STATEMENT *

Ingredients: Ham, bacon (cured with water, salt, sugar, sodium phosphate, sodium erythorbate, sodium nitrite), water, salt, sugar, sodium phosphates, spices, smoke flavoring, sodium erythorbate, sodium nitrite.

* COOKING INSTRUCTIONS *

BAKING INSTRUCTIONS

Sliced Bacon Grill: Cut into 8-10 slices; arrange in baking dish, spread with favorite sauce or glaze. Bake at 425°F for 10-12 minutes, microwave at High for 2 1/2-4 minutes or Pan Fry slices until browned on both sides.

Ready To Eat * Serve Hot Or Cold

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1095  days

STORAGE METHOD: Shelf Stable

* PIECE/PACK INFORMATION *

24/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

1. Use two trays per case.
2. Use Chep pallets.
3. Cube 0.40 on 24 pack
4. Ti=20 / Hi=5

* WEIGHTS *

    INNER PACKAGE NET WT(US):    12.0000 OZ
    INNER PACKAGE NET WT(Metric): 340.1943 GM

    MASTER CASE NET WEIGHT(lbs):   18.0000
    MEAT TARE WEIGHT (lbs):     4.8964
    PACKAGE TARE WEIGHT(lbs):   0.1036
    GROSS WEIGHT(lbs):      23.0000

    MASTER CASE NET WEIGHT(kg):   8.1648
    MEAT TARE WEIGHT (kg):     2.2210
    PACKAGE TARE WEIGHT(kg):    0.0470
    GROSS WEIGHT(kg):      10.4328

NOTE: Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

    ** NUTRITIONAL INFORMATION **

    NUTRITION FACTS

Serving Size: 2oz  (56g)
Servings Per Container: 6

| Amount Per Serving | | |
|---|---|---|
| Calories 160 | Calories from Fat 130 | |
| | %Daily Values | |
| Total Fat | 14 g | 22 % |

| | | |
|---|---|---|
| Saturated Fat | 5 g | 25 % |
| Trans Fat | N/A g | |
| Polyunsaturated Fat | N/A | |
| Monounsaturated Fat | N/A | |
| Cholesterol | 40 mg | 13 % |
| Sodium | 600 mg | 25 % |
| Total Carbohydrate | 1 g | 0 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 0 g | |
| Protein | 8 g | 16 % |

| | | | |
|---|---|---|---|
| Vitamin A | 0 % | Vitamin C | 25 % |
| Calcium | 0 % | Iron | 4 % |

## ** INGREDIENTS **

### * WIPs *

540371-0024  WIP BACN LMT CND 12 OZ

## ** FORMULAS **

Combine (generic) Formula

WIP   540371-0024 WIP BACN LMT CND 12 OZ          100.0000%
                          TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

### * DETAILED PACKAGING INSTRUCTNS *

1. Remove stretch wrap from the pallet of gold cans or remove the cans from the baskets and move to the labeling machine.
2. Cans are code dated on line 1 on top of can 36 months from production date stated on bottom of can.

Item#      Best If Used By: MM/DD/YYYY

3. Apply label (s) as specified in the bill of material to the gold cans and transfer to the Doboy.
4. Manually load the trays onto the Doboy.
5. Use the Doboy to pack 12 cans per tray.  Double stack 2 trays (total of 24 cans).
6. Then shrink wrap the double stacked trays.
7. After shrink wrapping, apply a product label to each case.
8. The date code information on the product label must match the format on the cans.
9. Transfer cases to a wood pallet, stack 100 cases per pallet, 5 layers, 20 cases per layer.
10. Stretch wrap pallet for support during transportation.

XI.  PRODUCT-BRAND: 10188-0401; Ham and Bacon Luncheon Loaf, Smoke Flavoring Added, Canned, 24/12 oz.

BRAND: HILLCNTY

MINOR LINE: 576 CANNED LUNCH MEAT/HAMS
SELL GROUP: REFRIGERATED VALUE ADDED

** GENERAL INFORMATION **

* DESCRIPTION *

Hill Country Fare Ham and Bacon Luncheon Loaf, Smoke Flavoring
Added, Canned, 24/12 oz.
Houston in plant code is 42917.

* CONSUMER NAME *

   H. E. B.

* COMPUTER NAME is HCF HAM BACN LNCH LF

* CATEGORIES *

   FC
   PORK
   PREPARED FOODS

* UPCs *

   0-41220-79907 7
   300-41220-79907 8

* INGREDIENT STATEMENT *

Ingredients:  Ham, pork, water, modified potato starch, salt, contains 2% or less of:  bacon (cured
with water, salt, sugar sodium phosphate, sodium erythorbate, sodium nitrite), sugar, sodium
phosphate, sodium erythorbate, sodium nitrite, smoke flavor, spices.

* COOKING INSTRUCTIONS *

Heating Instructions
Fully cooked and ready to eat. Enjoy hot or cold.

To Heat: Slice Hill Country Fare Bacon Luncheon Loaf and PAN FRY until browned on both
sides or Microwave on high for 2 1/2 to 4 minutes or BAKE at 425°F for 10-12 minutes.

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1095  days

STORAGE METHOD: Shelf Stable

* PIECE/PACK INFORMATION *

24/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

1. Use two trays per case.
2. Use Chep pallets.
3. Cube 0.40 on 24 pack
4. Ti= 20 / Hi=5

* WEIGHTS *

INNER PACKAGE NET WT(US):     12.0000 OZ
INNER PACKAGE NET WT(Metric): 340.1943 GM

MASTER CASE NET WEIGHT(lbs)    18.0000
MEAT TARE WEIGHT (lbs):      4.8964
PACKAGE TARE WEIGHT(lbs):   0.1036
GROSS WEIGHT(lbs):        23.0000

MASTER CASE NET WEIGHT(kg):   8.1648
MEAT TARE WEIGHT (kg):     2.2210
PACKAGE TARE WEIGHT(kg):     0.0470
GROSS WEIGHT(kg):        10.4328

NOTE: Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

** NUTRITIONAL INFORMATION **

NUTRITION FACTS

Serving Size: 2 OZ. SERVING  (56g)
Servings Per Container: 6

| Amount Per Serving | | |
|---|---|---|
| Calories 170 | Calories from Fat  120 | |

| | %Daily Values | |
|---|---|---|
| Total Fat | 14 g | 22 % |
| Saturated Fat | 4.5 g | 23 % |
| Trans Fat | 0 g | |
| Polyunsaturated Fat | 1.5 g | |
| Monounsaturated Fat | 6 g | |
| Cholesterol | 35 mg | 12 % |
| Sodium | 750 mg | 31 % |
| Total Carbohydrate | 3 g | 1 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 1 g | |
| Protein | 8 g | 16 % |

| Vitamin A | 0 % | Vitamin C | 0 % |
|---|---|---|---|

Calcium    2 %            Iron    2 %

## ** INGREDIENTS **

* WIPs *

   540865-0024  WIP HAM & BACN LNCH LF

## ** FORMULAS **

Combine (generic) Formula

WIP    540865-0024 WIP HAM & BACN LNCH LF            100.0000%
                                  TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

* DETAILED PACKAGING INSTRUCTNS *

1. Remove stretch wrap from the pallet of gold cans or remove the cans from the baskets and move to the labeling machine.
2. Cans are code dated on line 1 on top of can 36 months from production date stated on bottom of can.

    Item#    Best If Used By: MM/DD/YYYY

3. Apply label (s) as specified in the bill of material to the gold cans and transfer to the Doboy.
4. Manually load the trays onto the Doboy.
5. Use the Doboy to pack 12 cans per tray.  Double stack 2 trays (total of 24 cans).
6. Then shrink wrap the double stacked trays.
7. After shrink wrapping, apply a product label to each case.
8. The date code information on the product label must match the format on the cans.
9. Transfer cases to a wood pallet, stack 100 cases per pallet, 5 layers, 20 cases per layer.
10. Stretch wrap pallet for support during transportation.

XII.  PRODUCT-BRAND: 10186-0401; Ham and Pork Luncheon Loaf, Smoke Flavoring Added, Canned, 24/12 oz.

BRAND: HILLCNTY
MINOR LINE: 576 CANNED LUNCH MEAT/HAMS
SELL GROUP: REFRIGERATED VALUE ADDED

## ** GENERAL INFORMATION **

* DESCRIPTION *

Hill Country Fare Ham and Pork Luncheon Loaf, Smoke Flavoring Added, Canned, 24/12 oz.
Houston in plant code is 42927.

* CONSUMER NAME *

H. E. B.

* COMPUTER NAME is HCF HAM PK LNCH LF CND

* CATEGORIES *

  FC
  PORK
  PREPARED FOODS

* UPCs *

  0-41220-30608 4
  300-41220-30608 5

* INGREDIENT STATEMENT *

Ingredients: ham, pork, water, modified potato starch, salt, contains 2% or less of: sugar, sodium erythorbate, sodium phosphate, sodium nitrite, spices.

* COOKING INSTRUCTIONS *

HEATING INSTRUCTIONS

FULLY COOKED AND READY TO EAT.
ENJOY HOT OR COLD.

TO HEAT: Slice HILL COUNTRY FARE Luncheon Loaf and PAN FRY until browned on both sides or MICROWAVE on high for 2 1/2 to 4 minutes or BAKE at 425°F for 10-12 minutes.

* STORAGE AND HANDLING *

OPTIMAL SHELF LIFE: 1095 days

STORAGE METHOD: Shelf Stable

* PIECE/PACK INFORMATION *

24/12.0000 OZ CAN(s) per Case.

* METHOD OF PACKAGING *

  1. Use two trays per case.
  2. Use Chep pallets.
  3. Cube 0.40 on 24 pack
  4. Ti= 20 / Hi=5

* WEIGHTS *

INNER PACKAGE NET WT(US):     12.0000 OZ
INNER PACKAGE NET WT(Metric): 340.1943 GM

MASTER CASE NET WEIGHT(lbs):  18.0000
MEAT TARE WEIGHT (lbs):      4.8964
PACKAGE TARE WEIGHT(lbs):    0.1036
GROSS WEIGHT(lbs):        23.0000

MASTER CASE NET WEIGHT(kg):   8.1648
MEAT TARE WEIGHT (kg):     2.2210
PACKAGE TARE WEIGHT(kg):    0.0470
GROSS WEIGHT(kg):       10.4328

NOTE:  Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

** NUTRITIONAL INFORMATION **

NUTRITION FACTS

Serving Size: 2 OZ. SERVING  (56g)
Servings Per Container: 6

Amount Per Serving
Calories 160      Calories from Fat  120

| | %Daily Values | |
|---|---|---|
| Total Fat | 13 g | 20 % |
| Saturated Fat | 4.5 g | 23 % |
| Trans Fat | 0 g | |
| Polyunsaturated Fat | 1.5 g | |
| Monounsaturated Fat | 6 g | |
| Cholesterol | 35 mg | 12 % |
| Sodium | 750 mg | 31 % |
| Total Carbohydrate | 3 g | 1 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 1 g | |
| Protein | 8 g | 16 % |

| | | | |
|---|---|---|---|
| Vitamin A | 0 % | Vitamin C | 0 % |
| Calcium | 2 % | Iron | 2 % |

** INGREDIENTS **

* WIPs *

540860-0024  WIP HAM & PK LNCH LF

** FORMULAS **

Combine (generic) Formula

WIP   540860-0024 WIP HAM & PK LNCH LF          100.0000%
                          TOTAL 100.0000%

              ** PROCESSING PROCEDURES **

* DETAILED PACKAGING INSTRUCTNS *

1. Remove stretch wrap from the pallet of gold cans or remove the cans from the baskets and move to the labeling machine.
2. Cans are code dated on line 1 on top of can 36 months from production date stated on bottom of can.

     Item#      Best If Used By: MM/DD/YYYY

3. Apply label (s) as specified in the bill of material to the gold cans and transfer to the Doboy.
4. Manually load the trays onto the Doboy.
5. Use the Doboy to pack 12 cans per tray.  Double stack 2 trays (total of 24 cans).
6. Then shrink wrap the double stacked trays.
7. After shrink wrapping, apply a product label to each case.
8. The date code information on the product label must match the format on the cans.
9. Transfer cases to a wood pallet, stack 100 cases per pallet, 5 layers, 20 cases per layer.
10. Stretch wrap pallet for support during transportation.

XIII. PRODUCT-BRAND: 240870-0401; Lite Luncheon Loaf, Smoke Flavoring Added, Canned, 24/12 oz.

BRAND: HILLCNTY
MINOR LINE: 576 CANNED LUNCH MEAT/HAMS
SELL GROUP: REFRIGERATED VALUE ADDED

              ** GENERAL INFORMATION **

* DESCRIPTION *

Hill Country Fare Lite Luncheon Loaf, Smoke Flavoring Added, Canned, 24/12 oz.
Houston in plant code is 42937.

* CONSUMER NAME *

     H. E. B.

* COMPUTER NAME is HCF LNCH LF LITE CND

* CATEGORIES *

   FC
   PORK
   PREPARED FOODS

\* UPCs \*

  0-41220-79906 0
300-41220-79906 1

\* INGREDIENT STATEMENT \*

Ingredients:  Ham, water, modified potato starch, salt, contains 2% or less of:  sugar, sodium phosphate, sodium erythorbate, sodium nitrite, spices.

\* COOKING INSTRUCTIONS \*

BAKING INSTRUCTIONS

Spiced Luncheon Loaf:  Cut into 8-10 slices; arrange in baking dish, spread with favorite sauce or glaze.  Bake at 425°F for 10-12 minutes, microwave at High for 2 1/2-4 minutes or Pan Fry slices until browned on both sides.

\* STORAGE AND HANDLING \*

OPTIMAL SHELF LIFE: 1095  days

STORAGE METHOD: Shelf Stable

\* PIECE/PACK INFORMATION \*

24/12.0000 OZ CAN(s) per Case.

\* METHOD OF PACKAGING \*

1. Use two trays per case.
2. Use Chep pallets.
3. Cube 0.40 on 24 pack
4. Ti= 20 / Hi=5

\* WEIGHTS \*

    INNER PACKAGE NET WT(US):     12.0000 OZ
    INNER PACKAGE NET WT(Metric): 340.1943 GM

    MASTER CASE NET WEIGHT(lbs):  18.0000
    MEAT TARE WEIGHT (lbs):    4.8964
    PACKAGE TARE WEIGHT(lbs):    0.1036
    GROSS WEIGHT(lbs):         23.0000

    MASTER CASE NET WEIGHT(kg):   8.1648
    MEAT TARE WEIGHT (kg):     2.2210
    PACKAGE TARE WEIGHT(kg):     0.0470
    GROSS WEIGHT(kg):         10.4328

NOTE: Tare weights are a guide, each plant should determine its own tares.

* WEIGHT INDICATOR is Standard weight

## ** NUTRITIONAL INFORMATION **

### NUTRITION FACTS

Serving Size: 2 OZ. SERVING  (56g)
Servings Per Container: 6

---

Amount Per Serving
Calories 110          Calories from Fat  60

---

|  | %Daily Values |  |
|---|---|---|
| Total Fat | 6 g | 9 % |
| Saturated Fat | 2.5 g | 13 % |
| Trans Fat | 0 g | |
| Polyunsaturated Fat | 0.5 g | |
| Monounsaturated Fat | 3 g | |
| Cholesterol | 30 mg | 10 % |
| Sodium | 740 mg | 31 % |
| Total Carbohydrate | 3 g | 1 % |
| Dietary Fiber | 0 g | 0 % |
| Sugars | 1 g | |
| Protein | 9 g | 18 % |

---

| Vitamin A | 0 % | Vitamin C | 0 % |
|---|---|---|---|
| Calcium | 2 % | Iron | 2 % |

## ** INGREDIENTS **

* WIPs *

  540870-0024  WIP LITE HAM LNCH LF

## ** FORMULAS **

Combine (generic)  Formula

WIP   540870-0024 WIP LITE HAM LNCH LF          100.0000%
                             TOTAL 100.0000%

## ** PROCESSING PROCEDURES **

* DETAILED PACKAGING INSTRUCTNS *

  1. Remove stretch wrap from the pallet of gold cans or remove the cans from the baskets and
move to the labeling machine.
  2. Cans are code dated on line 1 on top of can 36 months from production date stated on bottom
of can.

Item#      Best If Used By: MM/DD/YYYY

3. Apply label (s) as specified in the bill of material to the gold cans and transfer to the Doboy.
4. Manually load the trays onto the Doboy.
5. Use the Doboy to pack 12 cans per tray. Double stack 2 trays (total of 24 cans).

6. Then shrink wrap the double stacked trays.
7. After shrink wrapping, apply a product label to each case.
8. The date code information on the product label must match the format on the cans.
9. Transfer cases to a wood pallet, stack 100 cases per pallet, 5 layers, 20 cases per layer.
10. Stretch wrap pallet for support during transportation.

**Section 2.3**

[Intentionally omitted.]

**Schedule 2.5**

[Intentionally omitted.]

**Schedule 2.11**

Bacon Grill™ (U.S. Registration No. 2,071,608; Canadian Registration No. 508,701)
American Pride™ (Seller's common law rights)

The "Recipes, Kitchen Processes, and related know-how" on Schedule 1.3, which is incorporated
herein this Schedule 2.11.

**Schedule 2.16**

| Customer | % of Total Revenues |
|---|---|
| Wal-Mart Stores, Inc. | 65.47 |
| H.E. Butt Grocery | 9.59 |
| Dollar General Corporation | 7.96 |
| Castleberry / Bumble Bee Seafood | 6.66 |
| Ziyad Brother Importing | 2.40 |
| Food Lion, Inc. | 1.86 |
| Liberty Gold Fruit Company, Inc. | 1.52 |

**Schedule 5.6**

Wal-Mart Stores, Inc.

H.E. Butt Grocery

Dollar General Corporation

Castleberry / Bumble Bee Seafood

§JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Zwanenberg Food Group (USA), Inc.

## DEFENDANTS
Tyson Refrigerated Processed Meats, Inc.

(b) County of Residence of First Listed Plaintiff   Hamilton
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   New Castle
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
See attached.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | ☐ 463 Habeas Corpus - Alien Detainee | | |
| | | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)
☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332, 28 U.S.C. 2201
Brief description of cause:
Breach of contract, breach of the covenant of good faith and fair dealing

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ 1,549,019.65
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE _____   DOCKET NUMBER _____

DATE   5/30/08
SIGNATURE OF ATTORNEY OF RECORD   _Sign B. Por_

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**<u>Plaintiff's Attorneys</u>**

MORRISON COHEN LLP

Edward P. Gilbert (eg3730)
Ethan R. Holtz (eh3324)
909 Third Avenue
New York, New York 10022
(212) 735-8600

BAYARD, P.A.

Peter B. Ladig (pl3513)
Stephen B. Brauerman (sb4952)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, Delaware 19899
(302) 655-5000
pladig@bayardlaw.com
sbrauerman@bayardlaw.com